## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-DP-00066-SCT

*WILLIE JEROME MANNING*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/08/94 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MARK WILLIAMSON |
| | CLIVE A. STAFFORD SMITH |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE STAEHLE LEE |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY (DIRECT APPEAL) |
| DISPOSITION: | AFFIRMED - 6/25/98 |
| MOTION FOR REHEARING FILED: | 7/29/98 |
| MANDATE ISSUED: | 10/15/98 |

### EN BANC.

### PITTMAN, PRESIDING JUSTICE, FOR THE COURT:

¶1. Willie Jerome Manning was indicted during the July 1994 term of the Circuit Court of Oktibbeha County in a two count indictment: Count 1 for the capital murder of Jon Steckler while engaged in the commission of a robbery in violation of Miss. Code Ann. § 97-3-19(2)(e) (1994) and as being an habitual offender in violation of Miss. Code Ann. § 99-19-83 (1994); and Count 2 for the capital murder of Tiffany Miller while engaged in the commission of a robbery in violation of Miss. Code Ann. § 97-3-19(2)(e) (1994) and as being an habitual offender in violation of Miss. Code Ann. § 99-19-83 (1994). Manning was tried and convicted of both counts of capital murder. The trial court then conducted the habitual offender hearing and found Manning to be an habitual offender and subject to life without parole. Thereafter, the jury listened to evidence and argument in aggravation and mitigation of the sentence to be imposed. The jury returned two sentences of death by lethal injection. December 16, 1994 was set as the date of execution. A motion for *j.n.o.v.* or in the alternative, a new trial, was filed on November 18, 1994. An amended motion for *j.n.o.v.* or in the alternative, a new trial, was filed on December 13, 1994. Hearing was held on these motions on

December 13, 1994, and they were denied. The execution of the death sentences was stayed pending appeal to this Court. Manning seeks review of twenty-one alleged errors by the trial court. Manning raises no issues warranting reversal, and the lower court's decision is affirmed. The issues presented on appeal are set out below as quoted from Manning's brief.

**I. WILLIE MANNING WAS DENIED HIS RIGHT TO EFFECTIVE COUNSEL AT BOTH PHASES OF THE TRIAL.**

**A. Lead defense counsel suffered from an obvious and highly prejudicial conflict of interest, exploited by the prosecution in front of the jury.**

**B. The other defense counsel, Richard Burdine, failed to provide effective assistance of counsel to Willie Manning at the penalty phase.**

**II. THE PROSECUTION WAS PERMITTED TO GET INTO THE DEFENDANT'S CHARACTER IN A WAY THAT WAS WHOLLY IMPROPER.**

**A. The prosecution injected into the trial endless evidence that Willie Manning was a criminal and generally evil person.**

**B. The prosecution did not stop at Willie Manning's character, but violated the rules with respect to other defense actors as well.**

**III. THE SHERIFF SHOULD NOT HAVE BEEN ALLOWED TO GIVE A SPECULATIVE OPINION BASED ON INADEQUATE DATA REGARDING ULTIMATE ISSUES WITHIN THE JURY'S SOLE PREROGATIVE.**

**IV. THE COURT DISPARAGED THE DEFENSE IN A MANNER THAT WAS WHOLLY INAPPROPRIATE.**

**V. THE DEFENSE WAS IMPROPERLY LIMITED IN ITS IMPEACHMENT OF THE WITNESSES FOR THE PROSECUTION.**

**A. The defense must be permitted to show that a prosecution witness could have been charged with several felonies rather than misdemeanors, to show that she received benefits for her testimony.**

**B. The defense should have been allowed to question the State's chief investigator about the scope of his investigation.**

**VI. THE RULES WERE SUBSTANTIALLY DIFFERENT FOR THE PROSECUTION, WHICH WAS ALLOWED TO PRESENT EVIDENCE OF A LIE DETECTOR TEST AND OTHER UNRELIABLE EVIDENCE.**

**VII. THE STATE PRESENTED EVIDENCE IN THE GUISE OF SCIENCE WITHOUT PROVING THAT ITS PROBATIVE VALUE OUTWEIGHED ITS EVIDENT PREJUDICIAL IMPACT.**

**A. So-called "forensic hair analysis" is nothing but latter-day voodoo, and should not be**

**allowed into the criminal courtroom.**

**B. The statement made by the ballistics expert--that there could be no chance of a false match of ballistic evidence--is entirely beyond the scope of that expertise.**

**C. Certainly, the sheriff should not have been allowed to testify to the ballistics test allegedly done by the F.B.I. in Washington, D.C.**

**VIII. WILLIE MANNING WAS DENIED A FAIR TRIAL BECAUSE THE STATE ABUSED ITS PEREMPTORY CHALLENGES TO STRIKE BLACK JURORS IN VIOLATION OF *BATSON V. KENTUCKY.***

**IX. JURORS WERE EXCUSED IN VIOLATION OF *WITHERSPOON V. ILLINOIS*.**

**X. JURORS PREDISPOSED AGAINST WILLIE MANNING SHOULD HAVE BEEN EXCUSED FOR CAUSE.**

**XI. THE USE OF PERJURY CHARGES TO INTIMIDATE WITNESSES WHO TESTIFIED TO MATTERS WITH WHICH THE PROSECUTION DISAGREES IS INCOMPATIBLE WITH THE RIGHT TO A FAIR TRIAL.**

**XII. THE VIOLATION OF THE RULES OF DISCOVERY PREJUDICED WILLIE MANNING'S RIGHT TO A FAIR TRIAL.**

**XIII. THE PHOTOGRAPHS USED AGAINST THE ACCUSED DENIED HIM A FAIR TRIAL.**

**XIV. THE DEFENSE EVALUATION OF WILLIE MANNING SHOULD HAVE BEEN BY AN INDEPENDENT EXPERT AND SHOULD NOT HAVE BEEN MADE A PART OF PUBLIC RECORD ACCESSIBLE TO THE PROSECUTION.**

**A. The defense had the right to proceed ex parte on application for funds since the prosecutor has no business playing a role in the development of defense tactics.**

**B. The defense was denied the right to meaningful investigative assistance.**

**XV. THE MOTION TO SUPPRESS EVIDENCE SHOULD HAVE BEEN GRANTED WHEN THE GOVERNMENT MISREPRESENTED THE RELIABILITY OF ITS INFORMANT.**

**XVI. THE FAILURE TO GIVE A CIRCUMSTANTIAL EVIDENCE INSTRUCTION AT THE FIRST PHASE OF THE TRIAL VIOLATED MANNING'S RIGHTS.**

**XVII. VARIOUS MOTIONS SHOULD HAVE BEEN GRANTED PRIOR TO TRIAL.**

**XVIII. THE CASE MUST BE REVERSED AND RENDERED SINCE THE EVIDENCE DOES NOT EXCLUDE THE REASONABLE POSSIBILITY THAT NO CRIME OCCURRED AT ALL IN THIS CASE.**

**XIX. THE AGGRAVATING CIRCUMSTANCES IN THIS CASE WERE**

**IMPROPERLY APPLIED.**

**A. The aggravating circumstance of "especially heinous, atrocious, and cruel" as to Count I (Jon Steckler).**

**B. The "kidnapping" aggravating circumstance as to both Counts.**

**C. The "robbery" aggravating circumstance as to both Counts.**

**XX. THE SENTENCING INSTRUCTIONS INADEQUATELY INSTRUCTED THE JURY ON THE MANNER IN WHICH THEY SHOULD CONSIDER MITIGATING AND AGGRAVATING CIRCUMSTANCES.**

**A. The listing of only irrelevant mitigating circumstances.**

**B. The denial of a life option instruction violated the eighth amendment.**

**XXI. THE ACCUMULATION OF ERROR IN THIS CASE REQUIRES THAT THE DEATH SENTENCE MUST BE SET ASIDE.**

## STATEMENT OF THE FACTS

¶2. The facts as reflected by the record in this case show that during the early morning hours of December 11, 1992, Tiffany Miller and Jon Steckler were both shot and murdered in Oktibbeha County, Mississippi. Tiffany and Jon were dating each other and were both students at Mississippi State University in Starkville, Mississippi. They were last seen alive leaving Jon's fraternity house between approximately 12:50 and 1:00 a.m. on December 11, 1992. Jon did not own a car but Tiffany drove a Toyota MR2 sports car. Tiffany lived off campus at University Hills Trailer Park.

¶3. Jon Steckler, lying in the right side of Pat Station Road in Oktibbeha County, was discovered by a motorist at approximately 2:15 a.m. that same morning. Sheriff Deputy Robert Elmore arrived on the scene at approximately 2:33 a.m. Jon still had a pulse and the deputy called for an ambulance. It was at this time the deputy also saw drag marks through the gravel road up into the woods on the side of the road where he discovered Tiffany's body. There was a large amount of blood on the road. Tiffany was found with one leg out of her pants and underwear, and with her shirt pulled up.

¶4. Tiffany had been shot twice in the face at close range, once in the left mid-forehead, and once around the mouth going through the lips. Either shot would have been fatal. Both projectiles were recovered from Tiffany's body. Jon's body had extensive abrasions which occurred prior to his death. Jon was shot once in the back of the head, which ultimately caused his death. The other injuries Jon received were consistent with being run over by a car at low speed. Neither body had any jewelry on it with the exception of a small silver fraternity medallion around Jon's neck.

¶5. At the murder scene, deputies discovered a gold token, three hulls or shell casings, and a projectile near to where Jon had been lying. The token was found between two large puddles of blood. Jon's wallet was still in his back pocket, but it did not contain any money. A set of car tracks went through the puddles of blood and had run over Jon Steckler.

¶6. Tiffany Miller's car was found the next morning parked in front of some apartments on Old

Mayhew Road. Blood was found on the car, under the car, on the sides of the car, as well as on the mud flaps and the spoiler. Hair and flesh were also found on the underside of the car. Some coins were found on the pavement by the driver's side door. Several more coins and a ring belonging to Tiffany were found about a hundred yards from the apartment complex driveway on the shoulder of Old Mayhew Road. These items were also approximately a hundred yards from Tiffany's residence at University Hills Trailer Park.

¶7. Around 11:00 p.m. the evening before the murder, a fraternity brother of Jon's, John Wise, loaned his car keys to his roommate so that he could retrieve a liter of Coke from Wise's car. Wise's car was parked outside the fraternity house. Approximately two and a half hours later, (1:30 a.m. on December 11, 1992), Wise went out to his car to get a cupcake he had purchased earlier. At that time he noticed that the door to the passenger side of the car was unlocked. He retrieved the cupcake quickly and locked the door. Around 8:00 a.m. or 9:00 a.m. later that morning, he again went out to his car and found that it had been burglarized. There was no sign of forced entry to the vehicle.

¶8. Wise related that the following items had been taken from his car: a portable CD player and adapter, a brown leather bomber jacket, a silver monogrammed huggie, and several dollars in change that he kept in the console. Included in this change was a rest room token that Wise received at a Grenada, Mississippi gas station. Only two places in the State of Mississippi use this type of token: a Kentucky Fried Chicken store in Laurel, and a Dutch Oil Company gas station in Grenada. Wise still had the box the CD player came in, which included the serial number of the CD player.

¶9. Jon wore a class ring from Cathedral High School in Natchez, Mississippi. He also wore a watch which had little clocks on the face of the watch. The appellant, Willie Jerome Manning, attempted to sell a class ring immediately after the murders. He also tried to sell a watch which matched to description of Steckler's watch.

¶10. After hearing about the car burglary, the sheriff contacted John Wise. Wise identified the coin found at the murder scene as being exactly like the rest room token taken out of his car. The sheriff then began to search for whoever burglarized Wise's car as the possible murderer. The silver huggie was found in April of 1993 by the Starkville Fire Department when they were flushing out a hydrant on Industrial Park Road just south of Starkville. This area is approximately five miles from where Manning lived with his mother. Manning then became the primary suspect in the case.

¶11. Paula Hathorn had dated Willie Jerome Manning. In the fall of 1992, Hathorn lived with Manning on and off at Ruth Ann Bishop's house. Bishop is Manning's mother. Hathorn testified that she saw Manning on December 9, 1992. He told her he was going to Jackson, Mississippi. He had with him a gun and some gloves. Hathorn next saw him on December 14, 1992. Manning no longer had the gun. At that time he brought several items into the house. One item was the leather jacket belonging to John Wise. Manning wore this leather jacket until a county deputy appeared at his mother's house. Word was out on the street that Manning was in possession of some jackets. Manning then gave Hathorn the jacket in the middle part of January or the first part of February, 1993.

¶12. Manning also brought in a CD player. Manning took the CD player to a business called Sound Reasoning. Using an assumed name, Manning attempted, but failed to sell the CD player at the store. Manning actually sold the Panasonic CD player to Emmitt Johnson on New Year's Eve. Johnson later

pawned the CD player in Jackson, MS at Metro Pawn. Metro Pawn recorded the serial number of the CD player when it was pawned. It matched the serial number of the CD player stolen from John Wise's car.

¶13. Manning also had a watch which matched the description of the one worn by Jon Steckler. Several days after the murders, Manning attempted to sell such a watch, as well as a gold ring similar to Steckler's class ring, to Barbara Duck. At the time he wore a leather jacket also similar to the one stolen from John Wise. Another witness also saw Manning wearing a leather jacket similar to Wise's, and a gold class ring and watch similar to Steckler's in December of 1992.

¶14. In April of 1993, Sheriff Dolph Bryan asked to speak with Hathorn. The sheriff asked Hathorn if Manning had any leather jackets. She then gave the sheriff the jacket Manning had given her. John Wise positively identified the jacket as the one which was stolen out of his car the night of December 10-11, 1992.

¶15. Hathorn also testified Manning used to target practice with a gun into trees and cans around his mother's house. She noticed him shooting into a particular tree at his mother's house in the first part of December of 1992. Based on Hathorn's statement to the sheriff, a search warrant was obtained for Ruth Ann Bishop's house. Investigators recovered .380 projectiles and slugs out of the tree described by Hathorn. The projectile found at the scene and the two projectiles taken from Tiffany Miller's body were fired from the same weapon as the projectiles taken from the tree into which Manning fired. Hathorn admitted that she had been convicted in the past for false pretense, and had not been promised anything in order to testify. The sheriff also confirmed Hathorn had not been promised leniency for her testimony.

¶16. Several witnesses put Manning at the 2500 Club in Starkville, MS on the night of the murders. However, only one witness, Gene Rice, could place Manning at the club at the time the murders occurred. He testified that he got into an argument with Manning that night because he was dancing with Paula Hathorn, Manning's girlfriend. None of the other witnesses knew Gene Rice or could remember him or Paula being at the club. None of them remembered a fight or argument either. Rice also gave conflicting statements about the time he last saw Manning at the club. At trial, he testified that he saw Manning around thirty to forty-five minutes before he left the club around 2:00 a.m. or 2:30 a.m. Rice gave a statement to the sheriff saying that he last saw Manning at the club at 12:30 a.m. or 1:00 a.m. None of the other witnesses could place Manning at the club past 12:30 a.m., and only one other could place him there that late.

¶17. When Manning was not staying at his mother's house, he would stay with friends. One friend was named Keith. Keith Hamlet owned a house and some property on Lampkin Road, which is approximately five miles from where Jon and Tiffany were killed.

¶18. In May of 1993, when Manning was incarcerated in the Oktibbeha County jail, an inmate by the name of Frank Parker overheard him speaking to another inmate by the name of Miami about pawning some guns. Manning told Miami that he didn't think they could convict him of the crime. Miami asked him what he did with the gun. Manning stated, "I had sold it on the street."

¶19. Also in May of 1993, Earl Jordan was incarcerated with Manning in the Oktibbeha County jail. Jordan was a cousin to Manning. Manning told Jordan that he had killed the students. Manning

assured him he was not joking. Later that day, Manning related to Jordan that he and another man (Jesse Lawrence[1]) were burglarizing a car at Mississippi State when they saw the two students. Manning pulled a gun on them and forced them into the car and drove off. They drove for awhile and then Manning ordered the students out of the car. According to the version Manning gave Jordan, Lawrence told Manning to get rid of the students. Manning then shot them. Manning told Jordan that he and Lawrence left the scene and went to Keith Hamlet's house. This conversation took place before Manning was charged with capital murder. Jordan was not promised any leniency or deals in exchange for his testimony.

## DISCUSSION OF LAW

### I. WILLIE MANNING WAS DENIED HIS RIGHT TO EFFECTIVE COUNSEL AT BOTH PHASES OF THE TRIAL.

### A. Defense counsel suffered from an obvious and highly prejudicial conflict of interest, exploited by the prosecution in front of the jury.

¶20. Manning's first assignment of error is that he was denied his Sixth Amendment right to effective assistance of counsel. He claims that his defense attorney, Mark Williamson, suffered from a conflict of interest which was prejudicial to Manning's case.

¶21. Manning bases his claim of ineffectiveness on the fact that Williamson had, in the past, represented one of the state's key witnesses. Williamson had represented Paula Hathorn on prior charges involving bad checks. At trial, Williamson, on cross-examination, attempted to impeach Hathorn with her prior charges. He brought out that she had agreed to pay the checks, but that she had not yet done so. On re-direct by the State, Hathorn testified that Williamson had been her attorney and that he had failed to take care of the checks as she had expected him to do. The State argues that it was necessary to bring this information out in order to rehabilitate Hathorn, to show why she had not yet paid.

¶22. Manning asserts that Williamson had a conflict of interest because he represented Hathorn on charges that were a significant source of impeachment. This, Manning argues, hindered Williamson in fully exploring the circumstances of those charges, pleas and sentences in order to protect his own reputation.

¶23. In order to succeed on his ineffective assistance of counsel argument, Manning must meet the standard set out in *Strickland v. Washington,* 466 U.S. 668 (1984), adopted by this Court in *Stringer v. State,* 454 So. 2d 468 (Miss. 1984). " The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686.

¶24. Manning must meet a two-part test: First, he must demonstrate that Williamson's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687. Second, Manning must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial. *Id.* Unless, Manning makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. *Id.*

¶25. In the case *sub judice*, Manning challenges the effectiveness of counsel based on loyalty, not competence. His claim is that Williamson had a conflict of interest. In *Smith v. State,* 666 So. 2d 810, 812 (Miss. 1995), this Court held "[t]he effective right of counsel encompasses the right to representation by an attorney who does not owe conflicting duties to other defendants." *Smith,* 666 So. 2d at 812(citing *Stringer v. State,* 485 So. 2d 274, 275 (Miss. 1986)). Actual conflicts of interest have also been found where defense counsel represented the defendant and witnesses for the State against the defendant. *See Littlejohn v. State,* 593 So. 2d 20 (Miss. 1992); *Smith v. State,* 666 So. 2d 810 (Miss. 1995).

¶26. Under the first prong, it must be determined if Manning's counsel was faced with an actual conflict of interest. Under the second prong, "[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance'." *Strickland,* 466 U.S. at 692 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350 (1980)); *Smith v. State,* 666 So. 2d 810, 812-13 (Miss. 1995)(quoting *Cabello v. State,* 524 So. 2d 313, 316 (Miss. 1988)).

¶27. Manning asserts that Williamson's prior representation of Hathorn hindered his cross-examination of her. He cites *Smith* and *Littlejohn* to support his contention that this was an actual conflict of interest that prejudiced him.

¶28. Both *Smith* and *Littlejohn* are distinguishable from the case at hand. In *Smith*, the defendant was convicted of selling cocaine to an undercover informant. Latham, the state's key witness, sold cocaine at the same location and time as Smith, but to a different informant. Smith and Latham were represented by the same public defender. Latham testified about Smith's participation in the double sale. Latham was not indicted for this charge. Latham had though pled guilty to a previous crime and sentencing was deferred. The public defender had negotiated that agreement with the State. On cross-examination, the public defender asked Latham if he had pled guilty to the previous charge, and Latham responded, "You was my lawyer, you could tell me." The record reflected that the public defender prematurely ended the cross-examination, leaving this Court to wonder why. This Court found that Latham's testimony became a centerpole of the State's case against Smith, and that the dual representation by the public defender of both Latham and Smith constituted an actual conflict of interest. This Court further found that the only explanation for the termination of the cross-examination was the public defender's loyalty to Latham. *Smith v. State,* 666 So.2d 810, 812-13 (Miss. 1995).

¶29. The case sub judice is distinguishable from *Smith*. At the time of the cross-examination in this case, Williamson owed no conflicting duty to Hathorn. In *Smith*, the public defender was still representing Latham as his sentencing had been deferred. Also, Hathorn was not a co-defendant and was not represented by Williamson on related charges or in any plea negotiations regarding her testimony in the case. In *Smith*, Latham was implicated, although not indicted, as a co-participant to Smith. Further, the public defender was representing him on a charge for which sentencing had been deferred. As it turns out, the defender continued to represent Latham and Smith for a year after the

trial when the charge to which Latham pled guilty was retired to the files, indicating to this Court that Latham was rewarded for his testimony. *Id.* at 812. Finally, Hathorn's testimony cannot be characterized as the centerpole of the State's case against Manning as Latham's was in *Smith.* Hathorn was one of a myriad of witnesses for the State including the sheriff, sheriff's deputies, police officers, and FBI agents. Manning argues that Hathorn's testimony alone linked him to the murder weapon. She did testify that she had witnessed him shooting into a tree. More damning testimony came, though, from a ballistics expert who matched the bullets from the tree to those that killed Jon and Tiffany.

¶30. ***Littlejohn v. State***, 593 So. 2d 20 (Miss. 1992), is also distinguishable. In that case, the attorney who represented the defendant was also counsel for the State's main witness in the trial against her for the same offense. The attorney had negotiated the State's witness's plea bargain. Part of the bargain was that the witness would testify against the defendant in her trial. ***Littlejohn,*** 593 So. 2d at 22-23. These facts are clearly distinguishable from the facts in the case at hand. Williamson had merely represented Hathorn in the past on totally unrelated charges. He did not represent her in any plea negotiations related to Manning's case, nor did he have a continuing or conflicting duty to her at the time of trial. See ***Perry v. State,*** 682 So. 2d 1027, 1030 (Miss. 1996).

¶31. The record indicates that Williamson conducted a full cross-examination of Hathorn. He asked her about her previous charges as well as whether she had been offered any deals in exchange for her testimony. It was not brought out until re-direct by the State that Williamson had been her attorney on some of the false pretense charges. The record does not indicate that Williamson's performance was affected by his prior representation of Hathorn.

¶32. Williamson did not have an actual conflict of interest in his representation of Manning, that affected his performance. Therefore, prejudice cannot be presumed. Manning must therefore, demonstrate the prejudice that he suffered. ***Perry v. State,*** 682 So. 2d at 1031. He must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Strickland v. Washington,*** 466 U.S. 668, 694 (1984). The question is whether there is a reasonable probability that, absent the errors, the jury would have had a reasonable doubt respecting guilt. ***Strickland,*** 466 U.S. at 695.

¶33. There is no reasonable probability that the result of this trial would have been different if the jury had never known that Williamson had represented Hathorn in the past. It is further pure speculation to assume that the jury, because Williamson was embarrassed by Hathorn's testimony, decided to hold it against Manning. Further, Williamson did not cut short his cross-examination of Hathorn as his representation of her did not come before the jury until re-direct by the State. He explored her prior convictions as well as whether she had been offered any leniency for her testimony. Manning has failed to show any prejudice resulting from Williamson's prior representation of Hathorn, and there is no reversible error here.

>    **B. The other defense counsel, Richard Burdine, failed to provide effective assistance of counsel to Willie Manning at the penalty phase.**

¶34. Manning also asserts that his other defense counsel failed to provide him with effective assistance. Manning complains that Burdine's performance was deficient because he made no opening statement in the penalty phase, only called two character witnesses (Manning's mother and aunt), and

gave an incoherent closing argument.

¶35. Under *Strickland,* Manning must show that Burdine's performance was deficient and that the deficiency resulted in prejudice to the defense. *Id.* at 687. This Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action' might be considered sound trial strategy'." *Id.* at 689. "When a defendant challenges a death sentence...the question is whether there is a reasonable probability that, absent the errors, the sentencer...would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

¶36. Manning asserts that he received ineffective assistance of counsel when Burdine failed to make any opening statement. In *Gilliard v. State,* 462 So. 2d 710, 716 (Miss. 1985), this Court held that the decision to make an opening statement is a strategic one. That holding was reiterated in *Cabello v. State,* 524 So. 2d 313, 318 (Miss. 1988). Manning offers no caselaw to the contrary and no proof of any prejudice this omission may have caused his defense. This claim is meritless.

¶37. Manning further asserts that Burdine provided ineffective counsel in failing to investigate thoroughly and to seek out more character witnesses. Burdine put on Manning's aunt and mother. The record reflects that Williamson wrote Burdine several letters informing him of potential penalty phase witnesses. Manning argues that Burdine never investigated or interviewed these witnesses. He further argues that the reason Williamson sent these letters to Burdine (and copies to the court file), was because Williamson was worried that Burdine was not preparing for the penalty phase.

¶38. "Just as courts presume that counsel's decisions are strategic, so courts are reluctant to infer from silence a lack of strategy." *Cabello v. State,* 524 So. 2d 313, 319(Miss. 1988); *Leatherwood v. State,* 473 So. 2d 964, 969 (Miss. 1985). There is no absolute duty to present mitigating evidence. *Wiley v. State,* 517 So. 2d 1373, 1379 (Miss. 1987). "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiley,* 517 So. 2d at 1379. *See also Strickland,* 466 U.S. at 699 (decision not to seek more character and psychological evidence was reasonable.)

¶39. It should be noted that Manning does not tell us in his brief what other witnesses should have been called or what mitigation they might have been able to offer. Further, there is nothing in the record to suggest that Burdine failed to contact these other witnesses about whom Williamson wrote to him. The reason for not calling these witnesses simply can not be gleaned from the record. Absent a record, Manning has not shown deficient performance by Burdine. He cannot overcome the presumption that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689.

¶40. Further, Manning cannot show prejudice. Without knowing what witnesses he thinks should have been called, and what they might have said, we cannot presume that had they been called, the jury would have voted for life instead of death. "The totality of the evidence before the judge or jury

should be considered in assessing whether there was prejudice." *Leatherwood v. State,* 473 So. 2d 964, 969 (Miss. 1985). The totality of the evidence in this case proved that Manning murdered Jon and Tiffany. The murders were brutal, and the victims were college students in the prime of their lives. Additional character witnesses would not have, with any reasonable probability, tipped the balance between mitigators and aggravators. See *Strickland,* 466 U.S. at 695. A reasonable probability is one sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694. This claim is meritless.

¶41. Finally, Manning argues that he was provided ineffective assistance of counsel because Burdine gave a closing argument that was "at best generic, and at worst incoherent." He asserts that Burdine's performance was substandard. The State argues, and we agree, that as a whole it can not be characterized as incoherent. Certainly, it is not so substandard as to have prejudiced the defense of Manning.

¶42. Manning cites two cases to support his argument that Burdine was ineffective in his closing argument. First, he relies on *Kubat v. Thieret,* 867 F.2d 351 (7th Cir.), cert. denied, 110 S.Ct. 206 (1989). In that case the reviewing court found that counsel was ineffective when he gave grossly substandard, rambling, and incoherent argument at sentencing. *Id.* at 368. In *Kubat,* the defense attorney did not call any character witnesses and opted to argue for mercy. The court found that the argument did not even amount to that. In fact, it found that the defendant may have been hurt by the argument. Defense counsel admitted that he was "not going to convince" the jury. He even asked the jury to compare the defendant to the victim and said, "[D]ecide the way you feel, Robert Kubat or Lydia Hyde." *Id.* The court found that counsel made no attempt to present the defendant as a human being. Second, Manning cites *State v. Myles,* 389 So. 2d 12 (La. 1979), in which the Supreme Court of Louisiana found that defense counsel provided ineffective assistance during closing argument of the sentencing phase. In that case, the Court found that counsel "did little more than acknowledge the existence of an aggravating circumstance, state that the confession may be used as a mitigating circumstance, and submit the matter to the jury." *Id.* at 30.

¶43. In the case at hand, Burdine did a considerably better job than either of the defense attorneys in the cases cited. He based his argument on a plea for mercy. He pleaded with the jury to show love for Manning, appealing to their Christian values. He asked them to put aside hate and vengeance, and to punish Manning properly with life imprisonment. He also argued residual doubt to the jury, asking them to think of how they would feel if it was discovered eventually that Manning was not the murderer. He asked them to think about how they would live with that. Further, Burdine argued the facts of the case, and the credibility of witnesses. He argued that the "heinous, atrocious, and cruel" aggravator was not supported by the evidence, and asked the jury to consider Manning's age as a mitigator.

¶44. Burdine's strategy of pleading for mercy was not a poor strategic choice on the facts of this case, and the argument when read as a whole is not incoherent. It is the opinion of this Court that Burdine's performance was not deficient. Additionally, Manning has not shown any resulting prejudice sufficient to meet the stringent standard set out in *Strickland.* This claim is meritless.

¶45. Based on the record in this case, we cannot say that Burdine provided ineffective assistance of counsel. Manning has failed to satisfy the standard set out in *Strickland,* and as such, we find no

reversible error.

## II. THE PROSECUTION WAS PERMITTED TO GET INTO THE DEFENDANT'S CHARACTER IN A WAY THAT WAS WHOLLY IMPROPER.

### A. The prosecution injected into the trial endless evidence that Willie Manning was a criminal and a generally evil person.

¶46. Manning's second assignment of error is that witnesses for the prosecution were allowed to testify to prior bad acts of Manning. Manning cites several instances in the record where he contends inadmissible evidence was admitted. First, he complains that Paula Hathorn was allowed to testify that three days after the murders, Manning came into the house carrying loads of goods. He asserts that this evidence should not have been allowed because it was clear that the goods had been stolen.

¶47. Manning is procedurally barred from asserting this claim because defense counsel failed to raise a contemporaneous objection to this testimony. *Hunter v. State,* 684 So. 2d 625, 631 (Miss. 1996); *Foster v. State,* 639 So. 2d 1263, 1270 (Miss. 1994)(quoting *Cole v. State,* 525 So. 2d 365, 369 (Miss. 1987)).

¶48. Additionally, this testimony was admissible under Miss.R.Evid. 404(b) which provides:

**(b)Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This testimony was admissible, not to show that Manning is a criminal, but to show motive and identity.

¶49. Manning also argues that it was error for the sheriff to testify that Manning had beaten Hathorn. The sheriff was asked how he had developed Hathorn as a witness. He explained that he knew that Hathorn and Manning had been dating and that Manning had beaten her, and so he thought that she might be willing to talk to him. This information was not elicited by the State. Additionally, the sheriff said it to explain why he thought Hathorn would talk to him. This claim for error has not been properly preserved for review by this Court because defense counsel failed to object to the statement. *Hunter, supra.*

¶50. Both instances complained of by Manning are meritless, and we find no reversible error.

### B. The prosecution did not stop at Willie Manning's character, but violated the rules with respect to other defense actors as well.

¶51. Manning asserts that his right to a fair trial was additionally compromised by improper impeachment of his witnesses.

#### 1. The prosecution was permitted to impeach a defense witness with his misdemeanor juvenile offenses.

¶52. Manning asserts that the State should not have been allowed to cross-examine Keith Higgins on

his juvenile offenses. He asserts that under Miss.R.Evid. 609(d), juvenile adjudications are not admissible. The rule provides:

> **(d)Juvenile Adjudications.** Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.

¶53. The exchange that took place between the prosecutor and Higgins is as follows:

Q: And as a matter of fact in both of those statements, on both of those occasions, what you told them was he wasn't there all night.

A: Naw, I--

Q: Isn't that right?

A: I never did say that. Like I told you at first, look, listen, you--now I'm going to explain it to you, and I'm explaining it just like dis, I'm a young black man up in this system and I know if I do something wrong already got the pencils on my neck, and all they doing is ready to chop it off, and I knew that I couldn't say this man wasn't dare--I mean was dare because I'm already in jail. I got two brothers in jail. I'm already got a charge against me. I knew they was going to throw me away.

Q: Who is they?

A: The system.

Q: The system was going to throw you away for telling the truth?

A: Yeah. They--they gave me six months in jail for public profanity.

Q: Now, Mr. Higgins, being fair, that wasn't your first offense, was it?

A: I never had no felony; only misdemeanor.

Q: How many misdemeanors have you had, Mr. Higgins?

BY MR. BURDINE: I'm going to object now, your Honor. He's getting into that juvenile problem.

A: That--that--that

BY THE COURT: Overruled.

A: --that was when I was a juvenile.

BY THE COURT: Overruled.

Q: I beg your pardon?

A: Well, let me see. I really can't count them. I, you know, I got--

Q: You can't count them all, can you?

A: They should have them on file somewhere.

Q: It's a bunch of them, isn't it?

BY MR. BURDINE: I'm going to object, your Honor. I'm going to reimpose that objection again.

BY THE COURT: I'll sustain this time. That's far enough, counsel.

¶54. It is clear from a reading of the record that Higgins invited this cross-examination by the prosecutor by implying that the "system" was out to get him. Additionally, the prosecutor did not elicit this testimony from Higgins. Higgins offered it to show how the system was out to get him.

¶55. The right of a defendant or prosecutor in using juvenile adjudications in criminal proceedings is preserved to show bias or interest. *Evans v. State,* 422 So. 2d 737, 745 (Miss. 1982). The State had the right to demonstrate Higgins's bias toward the system and to demonstrate a motive for testifying for Manning. In this context, we cannot say that the trial court erred in allowing this testimony, which related directly to Higgins's bias or interest. Further, once the prosecutor attempted to delve deeper into the juvenile adjudications, the judge sustained the defense objection, and stopped the prosecutor, before any prejudice resulted. There is no reversible error in this assignment of error.

> **2. A prosecution witness, a chief of police, was allowed to expostulate on his opinion as to the credibility of a defense witness.**

¶56. Manning asserts that Captain David Lindley with the Starkville Police Department should not have been allowed to testify that a defense witness, Carl Rambus, "personally does not have any credibility with me."

¶57. This claim for error is procedurally barred for failure to raise a contemporaneous objection. *Hunter, supra.* In addition, the testimony was admissible under Miss.R.Evid. 608(a), which provides:

> **(a)Opinion and Reputation Evidence of Character.** The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

¶58. This assignment of error is meritless.

> **III. THE SHERIFF SHOULD NOT HAVE BEEN ALLOWED TO GIVE A SPECULATIVE OPINION BASED ON INADEQUATE DATA REGARDING ULTIMATE ISSUES WITHIN THE JURY'S SOLE PREROGATIVE.**

¶59. Manning argues that it was error for the trial court to allow the sheriff to testify to his theory of the case on redirect examination by the prosecutor. The scope of redirect examination, while largely in the discretion of the trial court, is limited to matters brought out during cross-examination. *Evans v. State,* 499 So. 2d 781, 783 (Miss. 1986) (citing Miss.Unif.Crim.R.Cir.Ct.P. 5.08). This Court will not disturb a trial court's ruling on matters pertaining to redirect unless there has been a clear abuse of discretion. *Evans,* 499 So. 2d at 782.

¶60. Upon a thorough examination of the record, we find that the trial court only allowed the prosecution to redirectly examine the sheriff on matters that had been brought out on cross-examination by the defense. The testimony on cross-examination by Williamson, defense counsel, was as follows:

Q: Sheriff, what evidence do you have to show that the victims were kidnapped from the Sigma Chi parking lot?

A: Only that they were out on the side of Pat Station Road where they had been murdered.

Q: Okay. What evidence at the Sigma Chi Fraternity house do you have to indicate that they were kidnapped?

A: None.

Q: Okay. Sheriff, where did the *theory* of a kidnapping arise?

A: I guess it--it was my theory. It was because they--when you attack a--a case that you're working on, you've got to have a theory; you've got to have what you think happened so you can get out and investigate the case, and that's where that theory came from.

Q: Okay. Was there any evidence in the MR2 to indicate a kidnapping?

A: No.

Q: Sheriff, was there any evidence at the scene of the crime, uh, Pat Station Road to indicate a kidnapping?

A: I really don't know how to answer that. I would think by the fact that they had been taken out there and murdered that they didn't go there voluntarily. So that was the reason for attacking it under the--a kidnapping method.

Q: Well, Sheriff, you've testified there was no evidence of a kidnapping at the Sigma Chi Fraternity house, no evidence of a kidnapping at--in the car, so again, what evidence was there at the scene to indicate a kidnapping?

A: You asked my theory; I--I was explaining my theory.

Q: No. I asked what evidence--

BY MR. ALLGOOD: If--If your Honor please, I'm going to object to counsel arguing with the witness.

BY THE COURT: Don't argue with the witness, counsel.

BY MR. WILLIAMSON: I apologize to the Court and to the witness.

Q: What evidence was there at the scene that you un--discovered to indicate a kidnapping?

A: The circumstances would be the only evidence that there is that the students were kidnapped, the fact that they were taken out there and murdered. I still do not think they went out there voluntarily for that to happen.

Q: Sheriff, I believe you've testified that the--you feel Jon and Tiffany walked up and interrupted a car burglary in process. Is--is that correct?

A: That is my theory; yes, sir.

Q: Okay. Sheriff, on the MR2, do you have any evidence to indicate how they were sitting in the vehicle?

A: None. Not--none other than my theory.

Q: Okay. And, Sheriff, in--in the description of your theory, you--you do make reference to that they interrupted a burglary--car burglary in process.

A: I think they interrupted a car burglary; I think that's how this whole thing got started. I think they walked out and caught a man burglarizing a car and it lead to this.

Q: Okay. So your--your theory is that--then is that he wasn't finished burglarizing the car?

A: That's correct.

Q: Okay. Sheriff, do you know if there was anything left in the car to take, John Wise's car?

A: I don't--I do not know. I don't know if there was or not.

Q: Sheriff, what--what evidence do you have to show that they walked up on a burglary in process?

A: My theory only, sir.

Q: Okay. So there is no evidence?

A: That's correct.

¶61. Then, on re-direct examination, the State explored the Sheriff's theory. Defense counsel objected and the objection was overruled.

Q: Now you were cross-examined about and you were asked a number of questions about your, quote, "theory," unquote, about how this--this event occurred.

A: Yes, sir.

Q: First of all, if you would, detail for these ladies and gentlemen of the jury what your theory is insofar as each step of the way on this particular case is concerned.

BY MR. BURDINE: And that--and that--and I--we're going to object to that, your Honor. I don't--know they've been talking about a theory here, but I'm objecting to him drawing conclusion and opinion without laying a proper predicate and foundation for it.

BY THE COURT: Because of the cross examination of the witness concerning his theory or theories, the door is now opened for that to be gone into on redirect examination to clear up anything the attorney might feel is left confused by the cross examination. If it had not been gone into in the cross examination, I would not have allowed it. You may proceed. The objection is overruled.

The defense opened the door for the prosecution to explore the sheriff's theories about the crime. There was no abuse of discretion by the trial court, and therefore, no reversible error.

### IV. THE COURT DISPARAGED THE DEFENSE IN A MANNER THAT WAS WHOLLY INAPPROPRIATE.

¶62. Manning's next argument is that the trial judge disparaged defense counsel in a manner which violated Manning's right to a fair trial. He also argues that the judge's remark was an improper comment on the evidence. The defense, on cross-examination of the Sheriff sought to show that the Sheriff, in creating his list of suspects, had only included young black males. The judge allowed this questioning with the understanding that defense counsel would show its relevance. Counsel proceeded to question the sheriff on whether he was still looking for a white male in connection with a rape. When the questioning appeared to have no relevance, the prosecution objected. Defense counsel explained what he was trying to show and the trial judge asked, "And you consider that relevant in this case?" Defense counsel replied that he did think it relevant, and the trial judge allowed him to proceed without further comment.

¶63. Manning is procedurally barred from asserting this claim for error. If defense counsel felt that this comment by the trial judge was a comment on the evidence or a disparaging remark that would prejudice the defense, he should have requested a mistrial.

It is now well settled that when anything transpires during the trial that would tend to prejudice the rights of defendant, he cannot wait and take his chances with the jury on a favorable verdict and then obtain a reversal of the cause in this Court because of such error, but he must ask the trial court for a mistrial upon the happening of such occurrence when the same is of such nature as would entitle him to a mistrial.

*Ratliff v. State,* 313 So. 2d 386, 388 (Miss. 1975)(quoting *Blackwell v. State,* 44 So. 2d 409, 410 (Miss. 1950)).

¶64. We have held, that where a trial judge's remarks amount to a comment on the evidence, reversal is warranted. In *Wilson v. State,* 451 So. 2d 724, 725 (Miss. 1984), the trial judge, in ruling on a motion to suppress a confession, ruled before the jury that the confession was freely and voluntarily given. This Court held that the judge's statement "amounted to a peremptory instruction on the

confession and removed from the jury its function of deciding the credibility of the confession and the weight to be given to the testimony of the witnesses surrounding its execution." ***Wilson,*** 451 So. 2d at 726.

¶65. The case *sub judice* is distinguishable from ***Wilson.*** The trial judge did not make a comment on the evidence, but instead dropped the matter as soon as defense counsel said that he believed the testimony to be relevant. Further, in ***Wilson,*** defense counsel immediately objected to the judge's comment and requested a mistrial. In the case at hand, there was no objection and no request for a mistrial.

¶66. This assignment of error is procedurally barred and meritless.

### V. THE DEFENSE WAS IMPROPERLY LIMITED IN ITS IMPEACHMENT OF THE WITNESSES FOR THE PROSECUTION.

**A. The defense must be permitted to show that a prosecution witness could have been charged with several felonies rather than misdemeanors, to show that she received benefits for her testimony.**

### Paula Hathorn:

¶67. Manning asserts that he was allowed only limited impeachment of Hathorn. Manning claims that he was attempting to show that Hathorn could have and should have been charged with felonies instead of misdemeanors on her false pretense charges, subsequent to her stay in the penitentiary. In an effort to do that defense counsel asked Hathorn how much the checks had amounted to. The State objected to the question and the judge sustained the objection. Once the objection was sustained, defense counsel made no attempt to explain to the judge why he sought to elicit the amount of the checks, or what he intended to show with that evidence.

¶68. Mississippi allows "wide-open cross-examination of any 'matter affecting the credibility of the witness'." ***Meeks v.State,*** 604 So. 2d 748, 755 (Miss. 1992)(quoting Miss.R.Evid. 611(b));***Sayles v. State,*** 552 So. 2d 1383, 1385 (Miss. 1989); ***Miskelley v. State,*** 480 So. 2d 1104, 1111-12 (Miss. 1985). The "cross-examination includes a witness' possible interest, bias, or prejudice in a case." ***Meeks,*** 604 So. 2d at 755; ***Hill v. State,*** 512 So. 2d 883, 884 (Miss. 1987); ***Sayles,*** 552 So. 2d at 1386.

¶69. The State argues that the trial judge cannot be put in error because defense counsel made no attempt to argue to him why this evidence was relevant. Further the State argues that defense counsel was inquiring into the details of misdemeanor crimes that Hathorn admitted she committed, and that inquiry into the details of convictions for impeachment purposes is not allowed. The State cites ***Williams v. State,*** 512 So. 2d 666, 671 (Miss. 1987) as well as Miss.R.Evid. 608(b) to support its position. In ***Williams,*** the defendant had on direct examination admitted to the crime of trespassing. On cross-examination, the prosecutor asked "At that time, you broke in on a little twelve-year-old girl, didn't you?" Defense counsel immediately objected and the jury was told to disregard the question. This Court found that the question was improper, but that the admonition to the jury cured the potential error. ***Id.*** at 671.

¶70. Miss.R.Evid. 608(b) provides in pertinent part:

> **(b)Specific Instances of Conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1)concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Miss.R.Evid. 608(b). The Comment to Rule 608(b) states that details of the crime may not be elicited.

¶71. Manning asserts that defense counsel was not attempting to impeach Hathorn with evidence of the facts underlying the crimes, but was trying to inquire into whether she had received favorable treatment. He cites this Court's decisions in **Hill v. State,** 512 So. 2d 883 (Miss. 1987) and **Suan v. State,** 511 So. 2d 144 (Miss. 1987), to support his contention that this inquiry was appropriate.

¶72. In **Hill,** the State's main witness was a co-indictee of the defendant who had yet to be tried. The court impermissibly restricted cross-exa mination by defense counsel about any promises of leniency. **Id.** at 885-86. In **Suan,** defense counsel had attempted to show that a State's witness had been involved in prior criminal activity but had not been prosecuted. The court refused to allow such cross-examination. This Court held that to be reversible error. **Id.** at 148.

¶73. Both of these cases are distinguishable from the case *sub judice*. In **Suan,** this Court found that the nature and purpose of the cross-examination that defense counsel attempted was apparent from the record. **Id.** at 147. In the present case, the nature and purpose of the cross-examination is not apparent from the record, nor was it apparent to the trial judge.

¶74. In **Hill,** the witness that defense counsel sought to cross-examine was a co-indictee whose fate was still pending. In the present case, there was no evidence that Hathorn had any pending charges at the time of trial. Additionally, she and the sheriff testified that she had not been offered any sort of leniency in exchange for her testimony.

¶75. The record shows that Hathorn was fully cross-examined by defense counsel concerning her prior charges. She was also asked if she had received any leniency. There is nothing in the record to suggest to this Court or to the trial judge what purpose the defense had in inquiring into the details of Hathorn's prior charges. Miss.R.Evid. 103(a)(2) is controlling in this situation. It provides:

> **(a) Effect of Erroneous Ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, **and**

> (2) *Offer of Proof*. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked...

Miss.R.Evid. 103(a)(2).

¶76. Manning is procedurally barred from asserting this claim. Defense counsel should have made an offer of proof where the substance of the evidence was not apparent from the context within which the question was asked. Miss.R.Evid. 103(a)(2). Additionally, this assignment of error is meritless as evidence of the underlying facts or details of the crime should not be elicited. We find no reversible error here.

### Frank Parker:

¶77. Manning asserts that his impeachment of Parker was unfairly limited by the trial court. Frank Parker was the inmate in the Oktibbeha County jail who testified that he overheard Manning telling another inmate, Miami, that he didn't think he could be convicted of the crime and that he had sold the gun on the street. The defense sought to show that Parker had avoided liability for various crimes committed while he was in jail. The following exchange took place on cross-examination by defense counsel:

Q: Since you've been in the jail, have you--have you been charged with any crimes?

A: No, sir.

Q: Have you been accused of--

A: No, sir.

BY MR. ALLGOOD: If your Honor please, I'd object to what he'd been accused of in any event.

BY THE COURT: Sustained.

BY MR. WILLIAMSON: That's all I have, your Honor.

¶78. Generally, a witness should not be cross-examined regarding his involvement with crimes for which he has not been convicted, nor should he be impeached solely because he has been charged with a crime. *Wilkins v. State,* 603 So. 2d 309, 323 (Miss. 1992). The trial court did not err in limiting the impeachment of Parker. Additionally, defense counsel again failed to make an offer of proof under Miss.R.Evid. 103(a)(2), and therefore this claim for error is procedurally barred.

### Earl Jordan:

¶79. Manning also argues that his impeachment of Jordan was unfairly restricted. The defense attempted to impeach Jordan with the fact that he had allegedly confessed to a robbery on the MSU campus to show that he was receiving a benefit for his testimony and that he had committed a crime where Manning allegedly committed this one. Manning argues that when the judge sustained the prosecutor's objection, he unfairly curtailed Manning's cross-examination. However, Manning's contention is not supported by the record.

¶80. This time, defense counsel did make an argument to the judge concerning his purpose in the cross-examination. The judge agreed that defense counsel would be allowed to question Jordan as to whether he had been charged or not charged for certain crimes in exchange for his testimony under Miss.R.Evid. 608(b). However, he cautioned defense counsel that he could not inquire into the

details of those alleged crimes. Defense counsel then asked Jordan whether he had avoided prosecution in exchange for his testimony, and his answer was no.

¶81. We find that the trial court's ruling was not erroneous. The judge simply wanted defense counsel to lay the proper predicate and to comport with Miss.R.Evid. 608(b). The defense was not restricted from cross-examining Jordan on whether he had been charged or not charged with the armed robbery due to his cooperation. The defense was restricted from inquiring into the details of that crime. *Haralson v. State,* 314 So. 2d 722, 724 (Miss. 1975)("the witness may not be asked nor proof made of the details of an alleged crime said to have been committed by the witness sought to be impeached.").

¶82. From a reading of the record, it is clear that Jordan was thoroughly cross-examined. Further, there was other evidence before the jury that Jordan was hoping for some sort of deal to be made in exchange for his testimony. He admitted as much. The judge's ruling in this specific instance, did not prejudice Manning's case. The jury was well aware that there were other charges pending against Jordan and that he was hoping that by testifying against Manning, he would receive leniency. This claim of error is meritless, and we find no reversible error.

> **B. The defense should have been allowed to question the State's chief investigator about the scope of his investigation.**

¶83. Manning's next assignment of error is that his cross-examination of the Sheriff was improperly limited and that many of the hearsay objections from the prosecution were improperly sustained by the trial court. He complains that none of these objections should have been sustained because defense counsel was not offering any of this testimony to prove the truth of the matter asserted, but instead to demonstrate the scope of the investigation in this case.

¶84. The Mississippi Rules of Evidence define hearsay as:

> **(c) Hearsay.** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Miss.R.Evid. 801(c).

¶85. "The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." *Johnston v. State,* 567 So.2d 237, 238 (Miss. 1990)(citing *Hentz v. State,* 542 So.2d 914, 917 (Miss. 1989); *Monk v. State,* 532 So.2d 592, 599 (Miss. 1988)). "Unless [the trial judge's] discretion is so abused as to be prejudicial to the accused, this Court will not reverse his ruling." *Shearer v. State,* 423 So.2d 824, 826 (Miss. 1982)(citing *Page v. State,* 295 So.2d 279 (Miss. 1974)). "The discretion of the trial court must be exercised within the boundaries of the Mississippi Rules of Evidence." *Johnston,* 567 So.2d at 238.

¶86. Manning cites approximately ten instances in which he contends the trial judge erroneously excluded admissible evidence. In six of those instances, defense counsel's question to the sheriff called for an inadmissible hearsay response. The trial judge did not err in sustaining the prosecutor's objections to any of these questions. In another instance complained of by Manning, the question posed by defense counsel called for speculation on the part of the sheriff, which if answered, would

have invaded the province of the jury. The objection by the prosecutor was properly sustained. In the remaining instances, the prosecutor's objection to hearsay should not have been sustained. However, in each of those instances, defense counsel failed to make an offer of proof to show that he was not seeking to offer the testimony to prove the truth of the matter asserted, but instead was offering it for some other purpose. Therefore, Manning is procedurally barred from asserting this claim for error. Miss.R.Evid. 103(a)(2). Additionally, Manning has made no showing that the trial judge's erroneous rulings affected a substantial right of his. We find that the trial judge did not abuse his discretion in a manner that was prejudicial to Manning, and this is not reversible error.

### VI. THE RULES WERE SUBSTANTIALLY DIFFERENT FOR THE PROSECUTION, WHICH WAS ALLOWED TO PRESENT EVIDENCE OF A LIE DETECTOR AND OTHER UNRELIABLE EVIDENCE.

¶87. Manning's sixth assignment of error actually involves two claims. The first claim is that the prosecution was allowed to present evidence that one of its witnesses had volunteered to take a lie detector test. The second claim is that the trial court improperly allowed hearsay testimony to be admitted. Each claim will be discussed separately.

### A. Lie Detector

¶88. Earl Jordan was the State's witness to whom Manning allegedly confessed. On redirect examination by the prosecution, Jordan was asked if he had volunteered to take a lie detector test. To that, the defense objected, and the objection was sustained by the court. Thereafter, the court reviewed this Court's decision in *Conner v. State,* 632 So. 2d 1239, 1257-59 (Miss. 1993), and reversed his ruling. Defense counsel then asked if he would be allowed to recross Jordan on that point alone, and the judge refused. Manning argues that this testimony was prejudicial to his defense, and that at the very least he should have been allowed to recross Jordan.

¶89. In *Conner,* this Court held that neither the results of a polygraph nor the fact that one was actually taken may be admitted into evidence. *Conner,* 632 So. 2d at 1257. However, in that case, this Court cited *Pittman v. State,* 236 Miss. 592, 111 So. 2d 415 (1959), where the reference to a polygraph on redirect, where the results were not disclosed was not reversible error. Based on *Pittman, Stringer v. State,* 454 So. 2d 468 (Miss. 1984)(where the mere mention of the failure to submit to an examination could not be reversible error), and Miss.R.Evid. 608, the Court held that introduction into evidence of a witness's agreement to take a polygraph was not error. *Conner,* 632 So. 2d at 1259.

¶90. In the case before us, the prosecutor made no attempt to disclose to the jury whether a test was actually taken or what the results of the test were. He only elicited that Jordan had volunteered to take one. This was proper redirect after Jordan's credibility had been attacked on cross-examination by the defense.

¶91. The defense argues that even if the lie detector testimony was proper, it should have been allowed to recross Jordan about it. We find that the judge did not abuse his discretion in denying recross. The defense could have gained nothing from recross. Under the caselaw in this state, the defense could not have asked Jordan the results of his test or even if he actually took one. "Recross examination may be limited by the trial judge in his sound discretion." *Hubbard v. State,* 437 So. 2d

430, 434 (Miss. 1983). There is no merit to this claim, and no reversible error.

### B. Hearsay Violation

¶92. Manning next asserts that the trial court erred in overruling defense objections to hearsay testimony. The complained of testimony came from Frank Parker, a witness for the prosecution who overheard a conversation between Manning and an inmate named Miami. He was questioned by the prosecution about what he overheard. The defense objected on the basis of hearsay. The court overruled the objection because "the defendant was present when this occurred."

¶93. This testimony was admissible as an adoptive admission. Miss.R.Evid. 801(d)(2)(B) provides:

**(d) Statements Which Are Not Hearsay.** A statement is not hearsay if:

(2) *Admission by Party-Opponent.* The statement is offered against a party and is ... (B) a statement of which he has manifested his adoption or belief in its truth, ...

The common law version of this rule was set out in ***Jolly v. State,*** 269 So. 2d 650 (Miss. 1972). In that case, this Court said;

[S]tatements made by a third person, which tend to incriminate an accused, are admissible so long as they are made in the presence of the accused and are not contradicted, denied, nor objected to by the accused.

*Jolly,* 269 So. 2d at 656.

¶94. In the case sub judice, Miami's statements were made in the presence of Manning and he did not contradict, deny, or object to them. The general theory is that under these circumstances, Manning would have objected to the statements by Miami if they were untrue. When Miami asked what Manning did with the gun and Manning replied, "I had sold it on the street", he in effect admitted the statement as true. Under both the common law view and the rule of evidence, the conversation between Manning and Miami was properly admitted as an adoptive admission.

¶95. Manning also asserts that it was error for the trial judge to say "the defendant was present when this occurred", because it assumed as true a fact in issue--that Manning was present when these statements were made. We disagree. The trial judge did not have to assume this fact. Parker testified that Manning was there having the conversation with Miami. The judge simply restated what a witness had related as fact.

¶96. We find no reversible error in this assignment of error.

### VII. THE STATE PRESENTED EVIDENCE IN THE GUISE OF SCIENCE WITHOUT PROVING THAT ITS PROBATIVE VALUE OUTWEIGHED ITS EVIDENT PREJUDICIAL IMPACT.

### A. So-called "forensic hair analysis" is nothing more than latter-day voodoo and should not be admitted into the criminal courtroom.

¶97. The State called Chester Blythe, special agent with the FBI, to testify as an expert in the field of

hair analysis. He testified that he could "microscopically determine if the hairs look alike and determine with some degree of certainty, although not absolutely, but with some degree of certainty if hairs, for example, found in vacuum sweepings from an automobile originated from a particularly named individual." He also testified that in the two specimens he had, which were collected from Tiffany Miller's car, he was able to determine "that hairs that were found in these specimens exhibited characteristics associated with the black race." The defense objected to the testimony on the basis that it was more prejudicial than probative. The objection was overruled. After the prosecution had completed its direct examination of Blythe, the defense did not cross-examine him, but did renew its objection. It was again overruled.

¶98. On appeal, Manning argues that forensic hair analysis evidence should not be admitted in criminal trials because it is both nonsense and unreliable. However, this is not the basis upon which defense counsel objected at the trial. Manning is procedurally barred from having this Court consider his claim because an objection on one or more specific grounds constitutes a waiver of all other grounds. *Conner v. State,* 632 So. 2d 1239, 1255 (Miss. 1993).

¶99. Furthermore, this Court has found hair analysis expert testimony to be admissible stating that it is "a very useful [tool] in criminology." *Bevill v. State,* 556 So. 2d 699, 707 (Miss. 1990). The Court did, however, caution that a trial judge "should be guarded in the use of statistics in buttressing an expert witness's testimony, although probability analyses may be admissible in appropriate and carefully circumscribed instances." *Bevill,* 556 So. 2d at 707.

¶100. The trial judge did not abuse his discretion in admitting the hair analysis evidence. It was not more prejudicial than probative. The expert did not claim that the hair matched that of the defendant. He only testified that the hair came from a member of the black race. He also admitted that his expertise could not produce absolute certainty. This did not invade the province of the jury, but left it to them to decide if these were Manning's hairs or not. This assignment of error is both procedurally barred and meritless.

> **B. The statement made by the ballistics expert--that there could be no chance of a false match with ballistics evidence--is entirely beyond the scope of that expertise.**

¶101. Manning claims that the state's ballistics expert's testimony that the projectiles taken from Tiffany Miller's body and found at the scene matched the projectiles taken from the tree at Manning's mother's house was beyond the scope of his expertise. The portion of the expert's testimony that Manning argues was inappropriate was as follows:

> Q: That which has been marked State's for--in Evidence Number 37 which is a projectile found at the scene of these killings, and that which has been marked State's in Evidence 63 which are the two projectiles which have already been identified as being taken from the body of Tiffany Miller, they all three were fired from the exact same firearm, is that correct?
>
> A: That's correct.
>
> Q: To the exclusion of every other firearm in the world, is that correct?
>
> A: That's correct.

¶102. This portion does not represent the whole of the expert's testimony. Later in his testimony, the expert linked the projectiles taken from the victim to the projectiles taken from the tree in Manning's yard. However, Manning is particularly concerned with the language contained in this portion, specifically "to the exclusion of every other firearm in the world."

¶103. Manning cites this Court's decision in *Foster v. State*, 508 So. 2d 1111, 1118 (Miss. 1987) to support his position that these type of statements from experts are highly prejudicial and therefore inadmissible. However, Manning's reliance on *Foster* is misplaced. In *Foster,* the Court was concerned with an expert testifying that a knife "could have" been used in a murder. *Id.* at 1118. The Court was concerned that this type of testimony could mislead the jury. The opposite occurred in this case. There was no speculation. The expert was sure that the projectiles taken from the victims and the projectiles taken from the tree came from the same gun. This claim for error is meritless.

¶104. Additionally, Manning is procedurally barred from asserting this claim for failure to raise a contemporaneous objection at trial. *Hunter, supra.*

> **C. Certainly, the sheriff should not have been allowed to testify to the ballistics tests allegedly done by the F.B.I. in Washington, D.C.**

¶105. Manning next asserts that the sheriff should not have been allowed to testify to the results of ballistics tests performed by the FBI. On rebuttal, the prosecution called the sheriff to testify concerning a different .380 handgun that had been obtained from Billy Jefferson. The defense had called Jefferson to testify about a .380. The defense was attempting to show how guns pass from person to person on the street. The prosecution felt that this testimony had somehow left the jury with the impression that this gun could have been the murder weapon or that it had some significance to this case, which it did not. They, in turn, called the sheriff in rebuttal. He testified that Jefferson's .380 had been shipped to the F.B.I. crime lab, and that projectiles test fired from it did not match the projectiles that killed Jon and Tiffany.

¶106. This claim for error is procedurally barred from consideration by this Court for failure to raise a contemporaneous objection. *Hunter, supra.* We recognize that the testimony of the sheriff as to what was contained in an F.B.I. report was inadmissible hearsay. However, unobjected to hearsay, once received by the court and presented to the jury, becomes competent evidence and may aid in supporting a verdict the same as any other competent evidence. *Veal v. State,* 585 So. 2d 693, 697 (Miss. 1991). Furthermore, the sheriff's testimony did not improperly admit evidence against Manning, but was used to rebut the confusion left by defense counsel concerning an irrelevant piece of evidence. We find no reversible error.

> **VIII. WILLIE MANNING WAS DENIED A FAIR TRIAL BECAUSE THE STATE ABUSED ITS PEREMPTORY CHALLENGES TO STRIKE BLACK JURORS IN VIOLATION OF *BATSON V. KENTUCKY*.**

¶107. Manning's eighth assignment of error alleges a violation of *Batson v. Kentucky,* 476 U.S. 79 (1986) by the prosecution in its use of its peremptory challenges.

¶108. The record reflects that after the prosecution used six peremptory challenges, four on blacks and two on white jurors, it tendered twelve jurors to Manning. At that time, defense counsel objected

because the majority of the state's strikes were against blacks. The court required the State to state race neutral reasons for each of its peremptory strikes even though it found that there had not been a prima facie showing of racial discrimination. Then, the defense exercised its peremptories. It struck five white jurors. The State then asked the court to require the defense to state race neutral reasons for each of its peremptory strikes. The State then struck two more jurors, one white and one black, and submitted five more to the defense. The State again stated its race neutral reasons for the strikes. The defense then struck three more white jurors, and stated its race neutral reasons into the record. The prosecution then submitted three more jurors (all white) without exercising any peremptories. The defense struck two of them. The State used its ninth peremptory to excuse Juror #42, a black female, and submitted the next two on the list, two white males. The defense requested no race neutral reason for the strike of Juror #42, and the prosecution did not give one. The State used both of its alternate strikes, one against a black and one against a white. The defense did not ask for a race neutral reason for those strikes. At the end of jury selection, defense counsel objected to the racial composition of the jury. The judge offered to let the defense make the motion after he had had time to fully develop it, and the defense did so the next morning before the jury was sworn.

¶109. Under *Batson,* in order to make a prima facie showing of purposeful discrimination, the defendant must show (1) that Manning is a member of a cognizable racial group; (2) that the prosecutor exercised peremptory challenges to excuse a venire person of the defendant's race; and (3) that there is an inference that the venire persons were excluded on account of their race. *Batson,* 476 U.S. at 96; *Mack v. State,* 650 So. 2d 1289, 1296 (Miss. 1994). The burden thereafter shifts to the State to come forward with a race-neutral explanation for challenging the jurors. *Id.* at 1296. The reasons must be "'related to the particular case to be tried.'" *Chisolm v. State,* 529 So. 2d 635, 638 (Miss. 1988)(quoting *Batson,* 476 U.S. at 98). The prosecutor's explanation need not rise to the level of a challenge for cause. *Lockett v. State,* 517 So. 2d 1346, 1352 (Miss.1987)(citing *Batson,* 476 U.S. at 97).

¶110. However, the United States Supreme Court has held that "once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York,* 500 U.S. 352, 359 (1991).

¶111. In the case *sub judice*, the judge found that the defense had not established a prima facie showing of purposeful discrimination. However, he required the prosecution to state race-neutral reasons into the record. Additionally, he ruled that each of the reasons given by the prosecution was a race-neutral reason, and there was no intentional discrimination. Therefore, the issue of whether a prima facie showing was made is moot.

¶112. Manning now contests the striking of several jurors on the basis that the prosecution's reasons were pretextual. We find that, with the exception of one juror whom the prosecution offered no reason for striking, Manning has waived his right to contest the striking of these potential jurors because defense counsel offered no rebuttal to the prosecutor's challenges, and thus, failed to timely object to their dismissals so as to preserve this issue for review. *Blue v. State,* 674 So.2d 1184, 1212 (Miss. 1996). Nonetheless, each potential juror will be discussed individually.

### 1. Troy Fairley

¶113. Manning asserts that the State gave no reason at all for striking this juror, and as such, this case should be reversed. Troy Fairley was the State's ninth peremptory strike. The State argues that the defense never requested that the State give a race-neutral reason for this strike, and as such Manning is barred from challenging her dismissal. It is true that there was no request by the defense after this strike for a race-neutral reason. However there is some confusion in the record as to whether the court wanted reasons stated piecemeal or entirely. The following occurred after the State had submitted its second set of jurors to the defense.

> BY MR. ALLGOOD [sic]: Uh, your Honor, again we're going to object to the --the State's striking of, uh--
>
> BY THE COURT: Look, if you want to do a Batson objection do it after the State has exercised its peremptories. Dont--
>
> BY MR. WILLIAMSON: Okay.
>
> BY THE COURT: You want him to state his race neutral reasons for the strikes he's exercised on these, is that correct? Do you want to do it piecemeal? If that's so--
>
> BY MR. WILLIAMSON: Well we--we can do it entirely; that's fine.
>
> BY THE COURT: If that's so, if he's already done it, then state your race neutral reasons that you have for exercising those challenges on Juror Number 32 and Juror Number 35, please, Mr. Allgood.

It seems that Mr. Williamson had agreed to have the race-neutral reasons all stated at once at the end of the State's peremptories. However, the judge, even after this exchange, required the State to state its reasons for its strikes into the record, in piecemeal fashion. When Troy Fairley, Juror Number 42, was struck later, no race-neutral reason was given for her strike, nor was one requested. Manning argues in his reply brief that this is because the trial judge had asked the defense if they wanted to ascertain the State's reasons entirely at the end or piecemeal. The course of action taken by the court (in continuing to conduct the challenges on a piecemeal basis) should have caused defense counsel to ask for a race-neutral reason for Troy Fairley's strike. Further, even with defense counsel's understanding that all reasons for the strikes would be given at the end, when that was not done, defense counsel should have requested it. We can see no reason why the State would not have given a reason for striking Troy Fairley, when it had given one for every other juror struck, except for the fact that it was not asked to give one.

¶114. Additionally, the State argues, and we agree that there were sufficient race neutral reasons for striking Troy Fairley apparent in the record to indicate why the prosecution would not prefer her as a juror. She stated on her jury questionnaire that she mildly disagreed with the death penalty. She also stated in voir dire that she would have to know the motive for the killing before she could return the death penalty. She later said that motive would not be a requirement but that she would consider it. This statement would have been sufficient to challenge Fairley because there was no direct evidence of motive in this case. The record also reveals that Fairley was late for court one morning indicating a possible lack of commitment.

¶115. The record is sufficient to show that the State did not strike Troy Fairley because she is black. There were sufficient reasons for the State to strike her that are race-neutral. We find no reversible error in the striking of this potential juror.

### 2. James Graves

¶116. The prosecutor's reason for striking this juror was stated into the record.

BY MR. ALLGOOD: ...S-3 was to Mr. Graves. He was a black male. Mr. Graves is wearing gold chains; he is wearing a ring in his ear; he has, uh, shades, sun shades, sun glasses, hung in his--in his shirt or he has all during voir dire. Mr. Graves reads some very liberal publications, uh, which are the type of publications which have lately been carrying a lot of articles on the O.J. Simpson trial espousing O.J. Simpson's innocence, and based on all those factors, your Honor, I did not deem him a good State's juror in the instant case.

BY THE COURT: My list doesn't show he has an occupation. What do ya'll's list show; does he show any?

BY MR. ALLGOOD: He has no occupation, your Honor. That would be another factor...

¶117. First, Manning is procedurally barred from asserting this claim under *Blue, supra,* for failure to rebut the prosecutor's reason for the strike as pretextual.

¶118. Additionally, we find that the prosecutor's reasons for striking this juror were in fact race-neutral and not pretextual. This Court has said that demeanor may constitute a racially-neutral reason. Graves's wearing of gold chains, shades, and an earring are demonstrative of his demeanor, and this was a legitimate reason to strike him. *See Lockett v. State,* 517 So. 2d 1346, 1351-52 (Miss. 1987)(venire member struck for wearing hat in courtroom held race-neutral); *Bradley v. State,* 562 So. 2d 1276, 1283 (Miss. 1990)(juror excused for wearing overalls and black T-shirt held race-neutral).

¶119. In *Davis v. State,* 660 So. 2d 1228, 1242 (Miss. 1995), this Court reiterated the *Batson* holding that "'the prosecutor's explanation need not rise to the level of justifying exercise of a challenge for cause.'" *Davis,* 660 So. 2d at 1242(quoting *Batson,* 476 U.S. at 97). The United States Supreme Court pointed out in *Batson* that "'[t]here are any number of bases' on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause...however, the prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." *Davis,* 660 So. 2d at 1242 (quoting *Batson,* 476 U.S. at 98.)

¶120. We do not find any reversible error in the striking of this juror. There were sufficient race neutral reasons given by the prosecutor for this strike. Furthermore, this claim for error is procedurally barred. *Blue, supra.*

### 3. Cristi La Marque Robertson

¶121. The reasons stated for the peremptory challenge of this juror were stated into the record.

BY MR. ALLGOOD: Mr. Robertson, your Honor, lives in the functional equivalent of

Brooksville Gardens in this community; he lives in an extremely bad neighborhood. Uh, Mr. Robertson is a individual who once again reads those same magazines, the--the press which has had those articles on O.J. Simpson and things of that nature in it--contained in it. He did not complete his form, your Honor. On his, uh, questionnaire he did not fill out all the--the blanks and what have you and the incompleteness of the form made me obviously question the--the veracity of his responses to begin with, and those are my reasons for striking those two jurors.

¶122. Manning is procedurally barred from asserting this claim for error for failure to rebut the prosecutor's reason for the strike as pretextual. ***Blue, supra.*** As such, we find no reversible error.

### 4. Shirley A. Wooten

¶123. The State's reason for striking this venire member was stated into the record.

BY MR. ALLGOOD: If your Honor please, Shirley Wooten; she likewise indicated on her questionnaire that she did not know what she would do with the death penalty; uh, however, today she said that she could give it depending on the evidence. She the other day said she would do it. As a matter of fact, today she reiterated that, that if--she would do it if it was beyond a shadow of a doubt, and likewise, your Honor, she was, uh--she came in at work, uh, before this happened, according to one of the deputy sheriffs here, before she got a summons for this jury, stating that she did not want to serve on this jury, that she absolutely did not want to serve. I intend to accommodate her and that is my reasons for...challenging her.

¶124. Again, Manning is procedurally barred from asserting this claim for error for failure to rebut the prosecutor's reason for the strike as pretextual. ***Blue, supra.***

¶125. Additionally, there were sufficient race neutral reasons for Wooten's strike. It is clear from a reading of the record that Wooten was equivocal concerning application of the death penalty. On her questionnaire, she stated that she had no opinion on the death penalty and that she did not know if she could ever give it. During voir dire, she stated that she could give the death penalty after she had heard all the evidence and weighed it. Then, during individual voir dire, Wooten said that if the evidence proved beyond a shadow of a doubt that the defendant was guilty, she could give the death penalty. The prosecutor went on to clarify the difference between reasonable doubt and a shadow of a doubt, likening the latter to beyond all doubt. He asked her if he would have to prove his case beyond all doubt, and she responded "Well, yes." Then, when Wooten was questioned by the defense she said that she would not hold the State to a higher burden of proof than reasonable doubt.

¶126. In ***Davis v. State,*** 551 So. 2d 165, 171 (Miss. 1989), the trial court found that the State's reasons for its strikes were race-neutral. One of those reasons was that a potential juror had vacillated on the death penalty. One day she was against it and the next day she was for it. This Court found that the trial judge's findings were not clearly erroneous. Also in ***Mack v. State,*** 650 So. 2d 1289, 1300 (Miss. 1994), the prosecutor's reasoning, that a potential juror had said that she would automatically vote against the death penalty and then proceeded to vacillate back and forth, was a race-neutral reason.

¶127. Wooten's equivocation on the death penalty was not pretextual or discriminatory, but was a race-neutral reason for her strike. Furthermore, Manning is procedurally barred from asserting this

claim. We find no reversible error.

### 5. Joyce Merritt

¶128. The State's reasoning for striking this potential juror was as follows:

> BY MR. ALLGOOD: Juror Number 19, your Honor, uh, she likewise indicated she had no opinion on the death penalty on her--on her jury form; today she indicated that she did have an opinion on the death penalty. Once again, the wishy-washiness of the--of the juror on the death penalty. She also watches a tremendous amount of TV. I don't have the hours marked down here, uh, but she watched a--a large amount of TV. She also has some member in her family who is convicted of a crime. She is unemployed and she was making some eye contact with defense counsel and the lawyers who were--uh, not the lawyers, but the--the other men that were over there with defense counsel during some recesses. She likewise reads some of those publications which I perceive or--or have had articles in them on the O.J. Simpson trial, once again espousing the innocence of O.J. Simpson...

¶129. Manning only asserts that Merritt was not equivocal on the death penalty and that the State's reason for striking her was pretextual. Merritt stated in her questionnaire that she had no opinion on the death penalty but that she could vote to impose it. In voir dire, she stated that the evidence would have to be "without a doubt." The prosecutor asked her if the evidence was anything less than without a doubt if she could impose the death penalty and she responded that she could not. As discussed with potential juror Wooten, this type of equivocation is a legitimate and racially-neutral reason for a strike. Further, the prosecutor stated into the record several more obviously race-neutral reasons for this strike. This claim is meritless, and is also be barred from review by this Court because of defense counsel's failure to rebut the reason given as pretextual. ***Blue, supra.***

### 6. Ronald Henry

¶130. The prosecution's reason for striking Henry was as follows:

> BY MR. ALLGOOD: ...If your Honor, please, uh, S-4 was to Mr. Henry. Mr. Henry stated that he could not vote for the death penalty on the questionnaire; however, today he said that he could vote for it. Uh, he on the questionnaire said he had no opinion; today he said he did have an opinion. When the Court was asking or informing the jurors on the first day of the jurors being sequestered Mr. Henry was steadily shaking his head, uh, shutting his eyes. Uh, it was apparent to this attorney that he did not want to serve on this jury likewise. Finally a member of his family has been convicted of a crime. His brother was convicted of statutory rape. All these factors combined, uh, induced me to strike Mr. Henry.

¶131. Manning argues that the reasons given for striking Henry, in particular equivocation on the death penalty and the family member convicted of a crime, were applied inconsistently to white venire members in this case. He asserts that these reasons were merely pretextual.

¶132. Where multiple reasons lead to a peremptory strike, the fact that other jurors may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual. ***Moore v. Keller Indus. Inc.,*** 948 F.2d 199, 202 (5th Cir. 1991). This claim is also

barred for defense counsel's failure to rebut the prosecution's reason as pretextual. ***Blue, supra.***

## IX. JURORS WERE EXCUSED IN VIOLATION OF *WITHERSPOON V. ILLINOIS.*

¶133. In his ninth assignment of error, Manning asserts that three potential jurors were excluded for cause in violation of ***Witherspoon v. Illinois,*** 391 U.S. 510 (1968).

### 1. Chanteau Bowens

¶134. Manning argues that it is clear from the record that Bowens was able to consider the death penalty, and that her statements concerning the imposition of it were unequivocal. This contention is not supported by the record. On her jury questionnaire Bowens stated that she could never vote to impose the death penalty. On individual voir dire, Bowens equivocated back and forth. She first said that she could give the death penalty if it was due. She also said that at the beginning of the sentencing phase she would be favoring life over death. Then, she again stated that if the evidence warranted it, she could give the death penalty. Next, she said that given the two options, she would have to choose life over death. Then, one more time, she said that she could vote for the death penalty.

¶135. In ***Wainwright v. Witt,*** 469 U.S. 412 (1985), the United States Supreme Court attempted to clarify the exclusion standard in death penalty cases, set out in ***Witherspoon.*** The appropriate standard is;

> whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with ***Witherspoon's*** reference to "automatic" decision making, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism....many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings....there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law....deference must be paid to the trial judge who sees and hears the juror.

***Balfour v. State,*** 598 So. 2d 731, 755 (Miss. 1992)(quoting ***Wainwright,*** 469 U.S. at 424-25). This Court has said that the determination of whether a juror is fair and impartial is a judicial question. This Court will not set aside a trial court's determination that a juror is fair and impartial unless such determination clearly appears wrong. ***Carr v. State,*** 555 So. 2d 59, 60 (Miss. 1989).

¶136. It is clear from a reading of the record that Bowens was excused, over defense objection, because of her equivocation on the death penalty. Her statement that she would have to choose life over death demonstrates that her views would prevent or substantially impair her duties as a juror in accordance with her oath. Affording the appropriate deference to the trial judge who saw and heard Bowens, we cannot say that he abused his discretion. This claim of error is without merit.

### 2. Joyce Brown

¶137. Brown was challenged by the State because she equivocated on the death penalty. Over defense objection, she was excluded. On her jury questionnaire, Brown stated that she mildly agreed with the death penalty. To the question, "could you ever personally vote to impose the death penalty", she responded, "maybe". On individual voir dire, she stated that she did not think she could give the death penalty at this point. She said that if she had to say one way or the other whether she could give it, she would have to say no. Brown continued in this manner throughout her voir dire.

¶138. The analysis with this potential juror is the same as with the last. It is clear from the record that her views would have prevented her from carrying out her duties as a juror in accordance with her oath. The trial judge did not err in excluding Brown.

### 3. Cleo Stewart

¶139. Manning argues that Stewart should not have been excluded. The State argues that Manning is procedurally barred from asserting this claim because there was no objection raised to her challenge by the State. In fact the defense agreed with the State that Stewart had said that she could not impose the death penalty. The fact that Stewart could not impose the death penalty obviously would prevent her from carrying out her duties as a juror in accordance with her oath. This claim for relief is procedurally barred and wholly without merit.

### X. JURORS PREDISPOSED AGAINST WILLIE MANNING SHOULD HAVE BEEN EXCUSED FOR CAUSE.

¶140. Manning asserts that the trial judge erred by refusing to excuse potential jurors, Ramona Stevens and Patsy Lee. Ramona Stevens was challenged by the defense because she stated in voir dire that her father was in law enforcement, that she would probably be inclined to give more weight to something a law enforcement officer said, and that she probably could not be totally fair and impartial. The challenge for cause was denied by the judge. Patsy Lee was challenged because she saw a story about the case in the news. However, she said that she could disregard it. The challenge for cause was denied by the judge.

¶141. This claim for error is meritless. These two individuals did not serve on the jury, and both were peremptorily struck by the defense. Stevens was the defense's seventh peremptory strike and Lee was the ninth.

¶142. A prerequisite to an assertion of error in the denial of a challenge for cause is a showing by the defendant that he had exhausted all of his peremptory challenges and that the incompetent jurors were forced to sit on the jury by the trial court's erroneous ruling. See *Russell v. State,* 670 So. 2d 816, 826 (Miss. 1995). This is a showing that Manning cannot make, and as such he may not assert this error. Further, he may not complain that he was forced to peremptorily strike jurors that should have been stricken for cause.

> The loss of a peremptory challenge, however, does not constitute a violation of the constitutional right to an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the

defendant was denied his constitutional rights.

*Mettetal v. State,* 615 So. 2d 600, 603 (Miss. 1993)(citing *Ross v. Oklahoma,* 487 U.S. 81, 88 (1988)).

¶143. We find no reversible error in this assignment of error.

### XI. THE USE OF PERJURY CHARGES TO INTIMIDATE WITNESSES WHO TESTIFY TO MATTERS WITH WHICH THE PROSECUTOR DISAGREES IS INCOMPATIBLE WITH THE RIGHT TO A FAIR TRIAL.

¶144. Manning contends that the prosecutor improperly coerced a defense witness by threatening him with perjury charges. Keith Higgins, a witness for the defense, testified differently at trial than he had in a prior sworn statement to the police. After Higgins testimony, defense counsel asked to approach the bench. While there, the following exchange took place.

> BY MR. ALLGOOD: If your Honor please, while we're up here, uh, I was going to ask to do this at the recess, I don't want to do anything that's--that--that will in any way impinge upon the trial of this case; however, I think the last witness is in fact going to be charged with perjury, and I would think the Court would understand why; he has sworn two different ways on two different occasions.

> BY THE COURT: It will not be--

> BY MR. ALLGOOD: I don't want to do that during the course of the trial.

> BY THE COURT: It will not be done if--what--I have no control over what charges may or may not be made, but I do have control over this trial.

> BY MR. ALLGOOD: Right.

> BY THE COURT: It will not be done during the course of this trial.

> BY MR. ALLGOOD: That's what I wanted to ask the Court about. I just--I wanted to ask the Court guidance on that. I didn't want to ask--I didn't want to just go out and have somebody shooting an affidavit out and charging him and have him picked up during the trial--

> BY THE COURT: No.

> BY MR. ALLGOOD: --and there being a problem.

> BY THE COURT: Not during--it will be a problem if you do it during the course of this trial.

> BY MR. ALLGOOD: I will make sure I'm not going to have that done.

> BY THE COURT: Thank you. And then you want to speak to the bailiff for a moment?

> BY MR. WILLIAMSON: Yes, sir.

> BY THE COURT: You may--you may do so.

BY MR. WILLIAMSON: Thank you, your Honor.

BY MR. ALLGOOD: May I likewise speak to the sheriff a minute?

BY THE COURT: You may.

(MR. WILLIAMSON CONFERS WITH BAILIFF)

(MR. ALLGOOD CONFERS WITH SHERIFF)

BY THE COURT: You may proceed.

¶145. Manning alleges that "[t]his exchange, although out of hearing of the jury, appears to have been within hearing of at least one defense witness--Mario Hall, then on the stand." He contends that Hall, the bailiff, or the sheriff, certainly must have transmitted this exchange back to the witness room where other witnesses may have been intimidated to testify the way the prosecution wanted them to.

¶146. The record is totally devoid of any such inference. Manning cites absolutely no authority for this assignment of error, and as such this Court is not bound to address it. **Rogers v. State,** 599 So. 2d 930, 934 (Miss. 1992). Furthermore, this assignment of error is procedurally barred because the record reflects no contemporaneous objection to the district attorney's conduct. **Hunter, supra.** We find no reversible error.

## XII. THE VIOLATION OF THE RULES OF DISCOVERY PREJUDICED WILLIE MANNING'S RIGHT TO A FAIR TRIAL.

¶147. Manning alleges that the State violated the rules of discovery by not providing the defense with a witness's statement. Defense counsel objected to Keith Higgins being questioned about a statement that he gave to the police on the grounds that they had not been provided the statement through discovery. The objection was overruled on the basis that the witness had been called by the defense. The defense renewed its objection. Argument was heard outside the presence of the jury, and it was again overruled. After the prosecution had completed its cross-examination, defense counsel requested that he be allowed to cross-examine Higgins because he had been caught by surprise by the statement to the police. His request was objected to by the State, and the objection was sustained. Defense counsel then conducted redirect examination of Higgins. Manning alleges that the judge erred in overruling the objection and also in not allowing defense counsel to rehabilitate the witness, by cross-examining him, based on the discovery violation.

¶148. The State argues that under Uniform Criminal Rules of Circuit Court Practice Rule 4.06, which was in effect at the time of Manning's trial, it was not required to provide the defense with a copy of Higgins's statement because although Higgins was listed as a potential state witness, he was not called in the prosecution's case-in-chief, nor was his statement of September 27, 1994 used in the case-in-chief. According to the rule, the state is correct in its assertion.

¶149. Furthermore, the defense did not request a continuance as required by this Court in **Box v. State,** 437 So. 2d 19, 26 (Miss. 1983)(Robertson, J., specially concurring), and UCRCCP 4.06(i). This Court said in **Galloway v. State,** 604 So. 2d 735, 739 (Miss. 1992);

Moreover, the defendant should not be allowed to have his cake and eat it, too. Rule 4.06 imports no per se rule of inadmissibility. If on balance defendant is of the opinion that he has been unfairly surprised by the prosecution's undiscovered evidence, the rule requires he affirmatively request a continuance. After he has been allowed a reasonable opportunity to examine the evidence or to interview the witness, defense counsel must make a decision. The trial may otherwise have progressed to his satisfaction. He may feel that a reasonably favorable jury has been seated. For these or other reasons, at the time the evidence in question is offered, the defense may feel on balance he should proceed. He may have concluded that the prejudice likely to result from unfair surprise is outweighed by good breaks he has gotten on other aspects of the trial. Rule 4.06(i) accepts the premise that, as a matter of sound trial tactics, defense counsel, after his recess to acquaint himself with the new evidence, may rationally eschew moving for a continuance.

¶150. Beside the fact that this assignment of error is meritless, it is also procedurally barred for failure to request a continuance. There is no reversible error here. However, we do caution prosecutors to discover even this type of evidence. Although the rules do not specifically require it, we believe the more proper and prudent course would be to provide rather than withhold.

## XIII. THE PHOTOGRAPHS USED AGAINST THE ACCUSED DENIED HIM A FAIR TRIAL.

¶151. Manning asserts that the trial judge erred in admitting gruesome photographs of the victims into evidence. The defense objected to photographs S-58 and S-65 A-D, on the ground that they were prejudicial. These photographs were taken at the time of the autopsy. They were admitted during the testimony of the state pathologist, Dr. Steven Hayne. In overruling the defense objections, the trial judge ruled that the photographs depicted the injuries to the victims as testified to by Dr. Hayne.

¶152. Manning argues that black and white photos should have been used in order to reduce the potential for prejudice. As long as the color photographs are probative, they are admissible under the same conditions as black and white photographs. *Kelly v. State,* 278 So. 2d 400, 402 (Miss. 1973).

¶153. In *McNeal v. State,* this Court cautioned trial courts to consider all the facts and circumstances surrounding the admission of inflammatory photographs. Specifically, the trial court must consider, (1) whether the proof is absolute or in doubt as to the identity of the guilty party, and, (2) whether the photographs are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury. *McNeal v. State,* 551 So. 2d 151, 159 (Miss. 1989).

¶154. This Court has allowed photographs to show the different wounds to the victim, *Jenkins v. State,* 607 So. 2d 1171, 1175 (Miss. 1992), and in cases where they aided in the description of the circumstances of the murder and the corpse. *Westbrook v. State,* 658 So. 2d 847, 849 (Miss. 1995).

¶155. The standard of review for this issue is that the "admissibility of photographic evidence rests within the sound discretion of the trial judge. The lower court's ruling will be upheld on appeal unless abuse of discretion can be shown." *Jenkins v. State,* 607 So. 2d 1171, 1175 (Miss. 1992).

¶156. The photographs in question were autopsy photos of the two victims. Their probative value

was that they accurately depicted the wounds suffered by Jon and Tiffany, which were testified to by Dr. Hayne. Based on the caselaw, the pictures themselves, and the standard of review, the trial judge did not abuse his discretion in admitting these photographs. This assignment of error is meritless.

### XIV. THE DEFENSE EVALUATION OF WILLIE MANNING SHOULD HAVE BEEN BY AN INDEPENDENT EXPERT AND SHOULD NOT HAVE BEEN MADE A PART OF PUBLIC RECORD, ACCESSIBLE TO THE PROSECUTOR.

**A. The defense had the right to proceed ex parte on application for funds since the prosecutor has no business playing a role in the development of defense tactics.**

¶157. Manning alleges that the trial judge erred by requiring Manning to notice the prosecution when applying for funds to hire independent experts. Defense counsel filed a motion to proceed ex parte to the court on application for funds on March 7, 1994. The Court granted the motion on April 26, 1994. Manning contends that even though the judge granted the motion, his ruling at the hearing, which was held on March 30, 1994, on various motions limited his ability to proceed ex parte. At the hearing, defense counsel told the court that he wanted to avoid having to file a formal motion every time he wanted to make a small expenditure, such as having a map enlarged. The judge stated that he would authorize those types of reimbursements, but he cautioned defense counsel to use good judgment prior to spending those funds. He also told defense counsel to seek the State's as well as the court's opinion before spending funds. Then, the prosecutor stated that he thought that the State should be noticed if the defense was going to hire an expert, as well. The trial judge told defense counsel to notice the State when he intended to spend funds for which he would ask for reimbursement.

¶158. The State argues that the cautionary instructions to defense counsel only applied to the purchase of small items. Manning asserts the opposite. He complains that he was required to file into the record his motion for a determination of mental competency as well as the results. He argues that this requirement violated his right to expert assistance. He cites *Ake v. Oklahoma,* 470 U.S. 68 (1985) to support his position that in order to be entitled to expert assistance, the defendant must make an ex parte threshold showing that the expert assistance is likely to be a significant factor in his defense. *Id.* at 82-83.

¶159. The State concedes that the motion for a determination of mental competency was filed into the record and not ex parte. However, it argues correctly that the motion, which was filed on October 13, 1993, was filed five months prior to this hearing and four months prior to the motion to proceed ex parte. Manning was examined and a report was prepared on January 13, 1994. All of this occurred prior to the judge's comments, and therefore the comments could not have had any effect on the filing of this motion.

¶160. Furthermore, Manning did not attempt to use an insanity defense at trial and therefore had no right to an independent mental examination. Manning was examined and found competent to stand trial. This Court has said, "'[A]n indigent criminal defendant does not have a constitutional right to a psychiatrist of his personal liking or to receive funds to hire his own; rather he has a right only to a competent one.'" *Willie v. State,* 585 So. 2d 660, 671 (Miss. 1991)(quoting*Lanier v. State,* 533 So. 2d 473, 481 (Miss. 1988)(citing *Ake,* 470 U.S. at 83)).

¶161. Manning had no right to an independent mental examiner and he suffered no prejudice in not having one. This assi gnment of error is meritless. We do note here, however, that the State has no role to play in the determination of the defendant's use of experts. The necessity and propriety of such assistance is a matter left entirely to the discretion of the trial court.

### B. The defense was denied the right to meaningful investigative assistance.

¶162. Manning asserts that the trial court erred in granting his motion for an investigator too late to be of any assistance to him at trial. Defense counsel filed a motion to hire a criminal investigator on March 9, 1994. On March 30, 1994, the Court denied the motion because the court found that the defense had not demonstrated a particularized need for the investigator, and had no estimate as to how much the investigator might charge. The trial judge instructed defense counsel to present the motion to him when he could establish a particularized need and an estimate. Defense counsel stated that he would present the motion later in the day. In the afternoon, defense counsel asked for more time to develop the motion. There is nothing in the record to show that defense counsel ever presented this motion again. However, at some point this case was set for trial on September 27, 1994. On August 12, 1994, Manning filed for a continuance stating, "the Defendant's investigator has informed the Defendant's attorneys that he will need more time to fully investigate this case." On August 24, 1994, the judge granted the defendant's motion to hire an investigator. Apparently, though, the investigator had already been working on the case. On August 26, 1994, the continuance was granted and the trial was set for October 31, 1994.

¶163. The State argues that this gave the investigator around eighty days (from the date of the motion for a continuance to the trial date) to investigate the case, and that should have been sufficient time to do so. Manning argues that he was only allowed seventy days (from the date the motion for an investigator was granted to the trial date) and that this was an insufficient amount of time to conduct any meaningful investigation. He argues that this untimely relief was no relief at all.

¶164. If this amount of time was insufficient, then defense counsel should have asked for another continuance. Without this request, the trial judge could not make an adequate record of how much more time the investigator needed to prepare. It is the appellant's duty to make sure a claimed error is properly preserved for review. *Ballenger v. State,* 667 So. 2d 1242, 1252 (Miss. 1995).

¶165. This assignment of error is barred. Additionally, Manning has not shown why this amount of time was insufficient, or in what way additional time would have aided the investigator. This assignment of error is meritless.

### XV. THE MOTION TO SUPPRESS EVIDENCE SHOULD HAVE BEEN GRANTED WHEN THE GOVERNMENT MISREPRESENTED THE RELIABILITY OF ITS INFORMANT.

¶166. Manning contends that evidence found at his mother's house should have been suppressed by the trial judge because there was inadequate probable cause to support a warrant. His primary contention is that Paula Hathorn was not a reliable source for the basis of the warrants. One warrant was executed on April 27, 1993 and another on May 5, 1993. He also argues that the warrants did not state with particularity what items were to be seized.

¶167. The trial court conducted a hearing on the suppression motion, taking testimony from the officers who swore out the affidavits in support of the warrant. At the close of the evidence, the trial court ruled:

> The defendant is seeking to suppress certain evidence recovered pursuant to a search conducted with a search warrant that has been introduced as State's Exhibit in Evidence Number 1. The parameters of consideration of this hearing are those set forth in Gates versus Illinois and its progeny, and the Mississippi cases decided after Gates. Basically the Court must consider the totality of the circumstances in arriving at a determination whether probable cause to issue the warrant existed. The basic contention, as alleged by defense counsel, is that probable cause did not exist because the credibility of the witness is such that the witness who was the informant could not be considered to be reliable or credible therefore the information she furnished to the sheriff and that he in fact relayed to the justice court judge was so tainted and unreliable that it could not be considered as sufficient to give rise to probable cause. The underlying facts and circumstances as set forth in the application and affidavit for the search warrant in fact lists the informant's name. I now consider under the totality of the circumstances only a portion of the credibility of the witness and when I consider that portion I view that with the other circumstances also then and there available to the sheriff and given to the justice court judge. Warrants and underlying facts and circumstances can be supplemented by sworn oral testimony if the issuing magistrate so requires and the law favors the obtaining of search warrants. In this particular case the sheriff had information from one who was at one time close to the defendant, that is Paula Hathorn, that this particular defendant was in possession of an article identified as coming from a burglary on the same night of the disappearance of these two individuals, that a token had been recovered at the scene that came from one of those vehicles; he also had information concerning a huggie which was located on a road that is a route to the particular individual's house. The information given by Paula Hathorn was in fact in large measure not strictly relied on by the sheriff because of her credibility, but that he in fact verified the information. When she told him that she had a jacket given that matched the description of the one the sheriff was looking for, she in fact took him to the jacket and recovered it. That pretty much verifies information that she has told him, and even though she may be a convicted felon and not of good veracity or truthfulness, the way the sheriff checks it is to verify it to corroborate what she says, and he recovered the jacket based on what she said. That, coupled with the fact that she had twice on two previous occasions furnished information to the sheriff concerning, number one, a still for the manufacture of untaxed liquor that proved to be true, and the fact that she gave the sheriff's office information concerning another burglary in which some of the stolen goods were recovered turned out to be true. So the sheriff had two specific instances of prior information this defendant had furnished that had turned out to be credible, plus he verified what she had said concerning the particular jacket and had recovered that from her. Therefore the motion to suppress is hereby overruled.

¶168. Manning's primary contention is that Hathorn was not a reliable source upon which to issue a warrant. In addition to the affidavits in support of the warrants, the sheriff testified at the suppression hearing that he showed the justice court judge the jacket he had recovered from Hathorn. He also relayed to the judge that Hathorn had given reliable information on two previous occasions. Further, he told the judge that Hathorn had seen Manning shooting a gun at a tree in his mother's yard.

¶169. Manning also alleges that the warrant did not state with particularity the items to be seized in the search. The items to be searched for were listed as: "(1) cathedral class ring, Panasonic cd player, car keys to a MR2 Toyota, .380 auto., ammunition, spent shells, or projectiles, (1) Seiko watch, (1) Pulsar watch, any clothes with blood stains, necklace with diamond chips, & any & all other contraband and also a boot or shoe that matches the print that was found on Mayhew Road."

¶170. The standard of review for this probable cause determination is whether the justice court judge had a substantial basis for concluding that probable cause existed based on the totality of the circumstances. *Lee v. State,* 435 So. 2d 674, 676 (Miss. 1983)(citing *Illinois v. Gates,* 462 U.S. 213 (1983). This Court looks to both the facts and circumstances set forth in the affidavit as well as sworn oral testimony presented to the magistrate. *Williams v. State,* 583 So. 2d 620, 622 (Miss. 1991).

¶171. We find that the justice court judge had a substantial basis for concluding that probable cause existed based on the totality of the circumstances. First, the judge was shown the jacket which Hathorn said Manning had given her, and which John Wise had identified as being the one stolen from his car. Second, the judge was told of other instances in which Hathorn had been a reliable informant. Third, the judge was not misled into thinking that Hathorn was a pillar of the community. He had personal knowledge of her troubles with the law as she had been before him in the past. All of these facts should be sufficient to conclude that the judge had a substantial basis for issuing the warrant. Further, the warrant did state with particularity the items to be seized. The trial judge did not err in refusing to suppress the evidence obtained through this search warrant. There is no reversible error here.

### XVI. THE FAILURE TO GIVE A CIRCUMSTANTIAL EVIDENCE INSTRUCTION AT THE FIRST PHASE OF THE TRIAL VIOLATED MANNING'S RIGHTS.

¶172. Manning contends that a circumstantial evidence instruction should have been given in this case. The court denied the proposed instruction because it found that Earl Jordan's testimony (that Manning had confessed to him) removed the case from the wholly circumstantial category.

¶173. Manning's argument must fail because the testimony of Jordan was enough to eliminate the need for a circumstantial evidence instruction. Our decision in *Gray v. State,* 549 So. 2d 1316, 1324 (Miss. 1989), stands for the proposition that where there is direct evidence, a circumstantial evidence instruction is not a necessity. Additionally, in *Ladner v. State,* 584 So. 2d 743, 750 (Miss. 1991), we said that a confession which constitutes direct evidence is not limited to a confession to a law enforcement officer but also includes a confession to another person.

¶174. "The rule in Mississippi is that a circumstantial evidence instruction should be given only when the prosecution can produce neither eyewitnesses or a confession to the offense charged." *Stringfellow v. State,* 595 So. 2d 1320, 1322 (Miss. 1992). A confession "takes the case out of a circumstantial context" such that " a circumstantial evidence instruction [is] inapplicable." *Taylor v. State,* 672 So. 2d 1246, 1270 (Miss. 1996).

¶175. This case was not wholly circumstantial. Manning's confession to Jordan removed this case from the circumstantial realm, and as such the trial judge's denial of the circumstantial evidence instruction was proper. This assignment of error is meritless.

## XVII. VARIOUS MOTIONS SHOULD HAVE BEEN GRANTED PRIOR TO TRIAL.

¶176. Manning asserts that certain motions should have been granted by the trial judge prior to trial. Defense counsel moved the court to enjoin the families of the victims from showing emotion in the courtroom. The court ruled that the motion was premature and that he would use his discretion in maintaining the proper decorum in the courtroom. Defense counsel also filed a motion to keep the jurors separated so that they could not speak to anyone during the trial. The trial court granted that motion. Defense counsel asked the court to enforce that ruling alleging that Tiffany Miller's mother was being hugged and hovered over in front of the jury. He also alleged that she was sitting with the jury when it was being picked. He further alleged that while the mother was sitting with the Victim Witness Coordinator, the sheriff went over and hugged the mother. The trial court ruled that defense counsel had not shown any contact with the jury by Tiffany's mother. He also noted for the record that he had noticed no outpouring of emotion nor hugging nor anything of which defense counsel complained. He also noted that the jury was seated in a totally different part of the courtroom from the rest of the audience. He then asked defense counsel to notify him if defense counsel noticed any improper contact with jurors.

¶177. The record is insufficient to review this issue. It merely consists of complaints by defense counsel that some improper conduct occurred. The trial court noticed none of these improprieties. *Fuselier v. State,* 468 So. 2d 45 (Miss. 1985), does not mandate reversal where nothing is shown but speculation. Further, defense counsel must have been satisfied with the court's ruling because he did not request a mistrial and complained no more. Manning has demonstrated no prejudice here and this assignment of error is meritless.

¶178. Manning also complains that the trial court refused to reimburse mothers for their child care costs or to provide funds for those otherwise unable to serve on the jury. He asserts that this under compensation denied him the right to an impartial jury.

¶179. This issue is procedurally barred. Manning failed to object to the seating of the jury on this basis. He only objected to its racial composition. Once an objection is made on one ground, it waives all other grounds. *Conner v. State,* 632 So. 2d 1239, 1255 (Miss. 1993). Additionally, Miss. Code Ann. § 25-7-61 (1991) provides for the compensation of jurors. The trial judge had no authority to compensate jurors above what the statute allows. This assignment of error is barred from consideration and additionally, is without merit.

## XVIII. THE CASE MUST BE REVERSED AND RENDERED SINCE THE EVIDENCE DOES NOT EXCLUDE THE REASONABLE POSSIBILITY THAT NO CRIME OCCURRED AT ALL IN THIS CASE.

¶180. In this assignment of error, Manning challenges the sufficiency of the State's evidence. He contends that his motion for a directed verdict should have been granted. The State asserts that under the standards set out in *McFee v. State,* 511 So. 2d 130, 133 (Miss. 1987), the evidence in this case was sufficient and the jury's verdict should not be disturbed. In that case, this Court said:

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence--not just that supporting the case for the prosecution--in the light

most consistent with the verdict. We give prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb. See, e.g., *Gavin v. State,* 473 So. 2d 952, 956 (Miss. 1985); *May v. State,* 460 So.2d 778, 781 (Miss. 1984).

*Id.*

¶181. The facts of this case were fully discussed at the outset of this opinion. Based on those facts, and giving the proper deference to the jury, the evidence in this case was sufficient to support the jury's verdict. Items stolen from John Wise's car were traced to the defendant. Projectiles from a tree he was seen shooting into matched projectiles coming from the victims. Manning confessed to the killings to Earl Jordan. These facts along with all the other evidence support the jury's verdict sufficiently. This assignment of error is without merit.

## XIX. THE AGGRAVATING CIRCUMSTANCES IN THIS CASE WERE IMPROPERLY APPLIED.

### A. The aggravating circumstance of "especially heinous, atrocious, and cruel" as to Count 1 (Jon Steckler).

¶182. This aggravating circumstance was defined by jury instruction SSP-6. It said, "[t]he Court instructs the Jury that the term 'especially heinous, atrocious, and cruel' as used in these instructions is defined as being a conscienceless and pitiless crime which is unnecessarily torturous to the victim." Manning argues that there was no evidence that this crime was unnecessarily torturous to Jon Steckler. He asserts that the evidence showed that Jon was rendered unconscious immediately by a bullet that destroyed eighty percent of his brain.

¶183. The State contends that the killing of Jon was in fact "especially heinous, atrocious, and cruel". It cites this Court's decision in *Evans v. State,* 422 So. 2d 737, 743 (Miss. 1982), where the Court held that the jury could consider "mental torture and aggravation which the victim probably underwent" in order to determine whether the murder was "especially heinous, atrocious, and cruel". The State argues that Jon certainly experienced mental torture and aggravation during the drive to the rural road where he and his girlfriend were murdered.

¶184. The State further asserts that additional evidence of the heinousness of this crime is that Jon did not immediately die from the fatal wound to his head. In fact, he still had a pulse when a sheriff's deputy arrived, who in turn called an ambulance. He still had a pulse after being shot and then run over by Tiffany's car at a slow speed. The State contends that there can be no doubt that Manning's running over Jon was conscienceless and pitiless. We agree. This claim is meritless.

### B. The "kidnapping" aggravating circumstance as to both counts.

¶185. The "kidnapping" aggravating circumstance was defined in jury instruction SSP-7. The Court instructs the Jury that the term "Kidnapping" as used in these sentencing phase instructions, means the unlawful inveigling and kidnapping of another person, with the intent to unlawfully, willfully, and feloniously cause that person to be secretly confined or imprisoned against his or her will.

¶186. Manning argues that this instruction was inadequate because it failed to include the critical element of asportation.

¶187. There is no requirement that asportation be included in the definition of kidnapping. This Court said, in *Carr v. State,* 655 So. 2d 824, 849 (Miss. 1995), that Miss. Code Ann. § 97-3-53 (1994) does not require any allegation of transportation of the victim in the indictment. In fact, this Court plainly stated "that asportation was not a necessary ingredient of the indictment, so long as the indictment charges the victim was imprisoned against his will." *Brewer v. State,* 459 So. 2d 293, 296 (Miss. 1984)(citing *Cuevas v. State,* 338 So. 2d 1236 (Miss. 1976)).

¶188. The instruction given in this case was clearly sufficient and there is no merit to this assignment of error.

**Y. The "robbery" aggravating circumstance as to both counts.**

¶189. Manning next contends that evidence was insufficient to show that a robbery was committed to support the aggravating circumstance that the murder was committed during the commission of a robbery. He argues that the robbery was an afterthought to the murder and therefore cannot support a capital murder charge.

¶190. It is of no consequence when the robbery occurred. There was sufficient evidence of a robbery to sustain a conviction of capital murder so it follows that there was sufficient evidence to support the aggravating circumstance. Miss. Code Ann. § 99-19-101(5)(d)(1994) provides in pertinent part:

> The capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery...

¶191. At trial, there was plenty of evidence that these murders were committed while Manning was in the commission of a robbery. When the victims were found, Jon was missing his class ring and his watch. Tiffany had been robbed of her watch, a ring, a necklace, and her car.

¶192. Manning also argues that the robbery aggravating circumstance was invalid in this case because it does not sufficiently narrow the class of defendants that are eligible for the death penalty as it is an element of the offense. He cites no authority for this proposition and makes no real argument. This claim is barred from review. *Roberson v. State,* 595 So. 2d 1310, 1318 (Miss. 1992)(citing *Kelly v. State,* 553 So.2d 517, 521 (Miss. 1989)). Further, his contention is meritless as this Court has held many times that there is no error when the underlying felony and the aggravating circumstance are the same. See *Holly v. State,* 671 So. 2d 32, 39-40 (Miss. 1996).

**XX. THE SENTENCING INSTRUCTIONS INADEQUATELY INSTRUCTED THE JURY ON THE MANNER IN WHICH THEY SHOULD CONSIDER MITIGATING AND AGGRAVATING CIRCUMSTANCES.**

¶193. Manning asserts that the jury was not adequately instructed on the prosecution's burden to prove each aggravating circumstance beyond a reasonable doubt. He also argues that the instructions did not tell the jury that it could impose a life sentence even in the absence of mitigating circumstances, and that the instructions failed to provide the jury with examples of non-statutory mitigating circumstances so that they might understand their significance.

¶194. First, the jury instructions did instruct the jury that they were to find the aggravating circumstances beyond a reasonable doubt. The instructions, in part, read, "[i]f you unanimously find from the evidence in this case beyond a reasonable doubt that any one or more of the following aggravating circumstances exist:..." There is no merit to this claim for error.

¶195. Second, the instructions did instruct the jury that they could return a life sentence even in the absence of mitigators. That part reads, "[i]f after weighing the mitigating circumstances and the aggravating circumstances...you further unanimously find from the evidence that the aggravating circumstances outweigh the mitigating circumstances, *and* that the death penalty should be imposed, your verdict should be returned on a separate sheet of paper."(emphasis added). This part of the instruction makes it clear that the finding that the death penalty should be imposed is a separate decision to be made from the weighing of aggravators and mitigators. Further, there is no requirement that the jury be instructed that it has the power to vote for life imprisonment even if the mitigating circumstances do not outweigh the aggravating circumstances. *Foster v. State,* 639 So. 2d 1263, 1301 (Miss. 1994). There is no merit to this claim for error.

¶196. Finally, because a catch-all mitigating circumstance instruction was given in this case, it was not necessary for specific instructions to be given concerning non-statutory mitigating circumstances, which were not supported by the evidence. *Ladner v. State,* 584 So. 2d 743, 761 (Miss. 1991). Further, the record does not show that the defense requested anything other than the statutory mitigating circumstances. Additionally, there is no instruction in the record submitted by the defense that lists any non-statutory mitigating circumstances. As such, this claim is procedurally barred.

### A. The listing of only irrelevant mitigating circumstances.

¶197. Manning alleges the trial court erred in denying the defense request for an instruction on the absence of significant prior criminal history. The State argues that the evidence in the case did not support the giving of this mitigating circumstance, especially in light of the fact that Manning, at the time of trial, had two previous felony convictions and was adjudicated an habitual offender. The trial judge did not err in denying this instruction or in ruling that no evidence was presented by Manning to justify this mitigating circumstance. This assignment of error is meritless.

### B. The denial of a Life Option instruction violated the Eighth Amendment.

¶198. Defense counsel requested that a life option instruction be given in this case. He proposed two different instructions. The State objected to both instructions and the trial judge refused both on the basis that they are mercy instructions. The proposed instructions read as follows:

> **DSP-4:** The Court instructs the jury that during this phase of the trial, the burden of proof remains on the State to prove that this case is one that justifies the imposition of the death penalty, however, you the jury may return a life sentence in this cause, without finding any

mitigating circumstances in favor of the Defendant, Willie Jerome Manning.

> **DSP-7:** The Court instructs the jury that there is nothing which would suggest that the decision to afford Willie Jerome Manning mercy and thereby sentence him to life imprisonment violates the laws of this State or your oath as jurors, and even if you find there are no mitigating circumstances in this case which are worthy of your consideration, then, nevertheless, you still may sentence Willie Jerome Manning to life imprisonment.

¶199. The State argues that these instructions are mercy instructions and that it is not error for the trial court to refuse mercy instructions. It cites **Ballenger v. State,** 667 So. 2d 1242, 1264-65 (Miss. 1995) to support its position. In that case, an instruction nearly identical to DSP-7 was proposed. The State objected, and the trial court refused the instruction. This Court found no error in the refusal to give the mercy instruction.

¶200. This Court has stated time and again that a defendant is not entitled to a mercy instruction. **Foster v. State,** 639 So. 2d 1263, 1299-1301 (Miss. 1994); **Hansen v. State,** 592 So. 2d 114, 150 (Miss. 1991); **Ladner v. State,** 584 So. 2d 743, 761 (Miss. 1991); **Williams v. State,** 544 So. 2d 782, 788 (Miss. 1987). Furthermore, the jury in this case was fully informed of its right to return a life sentence with the following instruction:

> **DSP-2:** The Court instructs the jury that the prosecution carries the burden of showing not only that aggravating circumstances exist but also that they are sufficient enough to warrant death. If the prosecution proves the existence of an aggravating circumstance, you are free to find it insufficient to warrant death and are not required to automatically impose death.

The jury in this case was properly instructed and the refusal by the trial court to give mercy instructions does not constitute reversible error.

### XXI. THE ACCUMULATION OF ERROR IN THIS CASE REQUIRES THAT THE DEATH SENTENCE BE SET ASIDE.

¶201. Manning's final assignment of error is that the cumulative error in this case requires reversal.

¶202. This Court has held that individual errors, not reversible in themselves, may combine with other errors to make up reversible error. **Hansen v. State,** 592 So. 2d 114, 142 (Miss. 1991); **Griffin v. State,** 557 So. 2d 542, 553 (Miss. 1990). The question under these and other cases is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial. Where there is "no reversible error in any part, ...there is no reversible error to the whole." **McFee v. State,** 511 So. 2d 130, 136 (Miss. 1987).

¶203. We find that there is no cumulative error in this case warranting reversal.

¶204. **CONVICTION OF CAPITAL MURDER (TWO COUNTS) AND SENTENCE OF DEATH AFFIRMED. EXECUTION DATE TO BE SET WITHIN SIXTY DAYS OF FINAL DISPOSITION OF THIS CASE PURSUANT TO MISS. CODE ANN. § 99-19-105(7)(SUPP.**

**1995) AND M.R.A.P. 41(a).**

**SULLIVAN, P.J., BANKS, ROBERTS, SMITH, MILLS AND WALLER, JJ., CONCUR. PRATHER, C.J., CONCURS IN PART. McRAE, J., NOT PARTICIPATING.**

### APPENDIX

### DEATH CASES AFFIRMED BY THIS COURT

*Doss v. State,* --- So. 2d --- (Miss. 1997).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1123 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State**, 554 So. 2d 887 (Miss. 1989), **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding, **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d 165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State**, 538 So. 2d 329 (Miss. 1989), **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

***Clemons v. State**, 535 So. 2d 1354 (Miss. 1988), **Clemons v. Mississippi**, 494 U.S. 738 (1990) vacating and remanding, **Clemons v. State**, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

***Jones v. State**, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating

and remanding, ***Jones v. State***, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

***Wiley v. State***, 484 So. 2d 339 (Miss. 1986).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

***Johnson v. State***, 477 So. 2d 196 (Miss. 1985).

***Gray v. State***, 472 So. 2d 409 (Miss. 1985).

***Cabello v. State***, 471 So. 2d 332 (Miss. 1985).

***Jordan v. State***, 464 So. 2d 475 (Miss. 1985).

***Wilcher v. State***, 455 So. 2d 727 (Miss. 1984).

***Billiot v. State***, 454 So. 2d 445 (Miss. 1984).

***Stringer v. State***, 454 So. 2d 468 (Miss. 1984).

***Dufour v. State***, 453 So. 2d 337 (Miss. 1984).

***Neal v. State***, 451 So. 2d 743 (Miss. 1984).

***Booker v. State***, 449 So. 2d 209 (Miss. 1984).

***Wilcher v. State***, 448 So. 2d 927 (Miss. 1984).

***Caldwell v. State***, 443 So. 2d 806 (Miss. 1983).

***Irving v. State***, 441 So. 2d 846 (Miss. 1983).

***Tokman v. State***, 435 So. 2d 664 (Miss. 1983).

***Leatherwood v. State***, 435 So. 2d 645 (Miss. 1983).

***Hill v. State***, 432 So. 2d 427 (Miss. 1983).

***Pruett v. State***, 431 So. 2d 1101 (Miss. 1983).

***Gilliard v. State***, 428 So. 2d 576 (Miss. 1983).

***Evans v. State***, 422 So. 2d 737 (Miss. 1982).

***King v. State***, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).


## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court,case was remanded by this Court for a new sentencing hearing.


## DEATH CASES REVERSED AS TO GUILT PHASE

### AND SENTENCE PHASE

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).


**DEATH CASES REVERSED AS TO GUILT PHASE**

**<u>AND SENTENCE PHASE</u>**

(**continued**)


**Smith v. State**, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).


## DEATH CASES REVERSED

## AS TO PUNISHMENT AND REMANDED

## <u>FOR RESENTENCING TO LIFE IMPRISONMENT</u>

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).


## DEATH CASES REVERSED AS TO

**PUNISHMENT AND REMANDED FOR A NEW TRIAL**

**ON SENTENCING PHASE ONLY**

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (Miss. 1996)

**DEATH CASES REVERSED AS TO**

**PUNISHMENT AND REMANDED FOR A NEW TRIAL**

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State*, 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).

* Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.

1. Lawrence was incarcerated on the night of the murder in Prichard, Alabama.